UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Headfirst Baseball LLC
2440 Wisconsin Avenue, N.W.
Suite 201
Washington, DC 20007

     and

Headfirst Camps LLC
2440 Wisconsin Avenue, N.W.
Suite 201
Washington, DC  20007

     and

Brendan V. Sullivan III
2944 Davenport Street, N.W.
Washington, DC  20008

          Plaintiffs,

  versus

Robert Elwood
3274 Harness Creek Road
Annapolis, Maryland 21403

     and

Stacey Elwood
3274 Harness Creek Road
Annapolis, Maryland  21403

         Defendants.

Civil Action No. 13-cv-536

## **COMPLAINT**

1.     Over the course of many years, Robert Elwood stole hundreds of thousands of dollars from his employers, Headfirst Baseball and Headfirst Camps.  Headfirst Baseball and Headfirst Camps bring this action to recover the money that Elwood stole.

2.     Elwood's spouse, Stacey Elwood, willingly participated in the misappropriation of Headfirst funds and the cover-up of that misappropriation.

3.     In addition, Robert Elwood fraudulently induced Sullivan to form a separate limited liability company with him that became known as Headfirst Professional Sports Camps, LLC.  This lawsuit seeks a declaratory judgment that Sullivan is the sole owner of that company.

4.     Finally, Elwood, despite being terminated from Headfirst Camps, continues to interfere with the business.  Headfirst Baseball, Headfirst Camps and Sullivan seek an injunction that Elwood cease and desist from doing so.

<u>**Jurisdiction and Parties**</u>

5.     Plaintiff Headfirst Baseball LLC is a citizen of the District of Columbia with its principal place of business at 2440 Wisconsin Avenue, N.W., Suite 201, Washington, D.C. The members of Headfirst Baseball LLC are plaintiff Brendan V. Sullivan III, a citizen of the District of Columbia, and his brother Ted Sullivan, a citizen of the State of New York.  The business, Headfirst Baseball LLC, was originally founded 15 years ago. Headfirst Baseball LLC has also done business under the trade name Headfirst Camps and is referred to throughout this Complaint as "Headfirst Baseball."   Robert Elwood has never been a member of Headfirst Baseball.

6.     Plaintiff Headfirst Camps LLC is a citizen of the District of Columbia with its principal place of business at 2440 Wisconsin Avenue, N.W., Suite 201, Washington, D.C.

The only member of Headfirst Camps LLC is plaintiff Brendan V. Sullivan III, a citizen of the District of Columbia. Robert Elwood has never been a member of Headfirst Camps LLC. Headfirst Camps LLC is referred to throughout this Complaint as "Headfirst Camps." Headfirst Baseball and Headfirst Camps are referred to throughout this Complaint, either together or separately, as "Headfirst" or the "Companies."

7.     Plaintiff Brendan V. Sullivan III is an individual, who is a citizen of the District of Columbia. Brendan V. Sullivan III resides at 2944 Davenport Street, N.W., Washington, D.C. 20008. He is a member of Headfirst Baseball, Headfirst Camps and Headfirst Professional Sports Camps LLC. Plaintiff Brendan V. Sullivan III is called Sullivan throughout this Complaint.

8.     Defendant Robert Elwood is a citizen of the State of Maryland residing at 3274 Harness Creek Road, Annapolis, Maryland 21403. Defendant Elwood worked for Headfirst for many years, until he was discharged on December 31, 2012. Defendant Robert Elwood is called Elwood throughout this Complaint.

9.     Defendant Stacey Elwood is the spouse of co-defendant Robert Elwood. Stacey Elwood is a citizen of the State of Maryland residing at 3274 Harness Creek Road, Annapolis, Maryland 21403. Stacey Elwood is called Ms. Elwood throughout this Complaint.

10.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is diversity of citizenship between plaintiffs and defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) as the district where a substantial part of the events giving rise to the claim occurred.

## Introduction

12.    Headfirst Baseball was owned and operated for years by Sullivan and his brother Ted Sullivan. Headfirst Baseball became a very successful business recognized for excellence in its summer camp programs and other athletic programs for youngsters. Headfirst is uniformly respected and admired by thousands of youngsters and their parents. Headfirst provides work for approximately 15 full-time people and seasonal staff of close to 350, many of whom are teachers and coaches, during the summer months. During peak weeks in the summer, approximately 1,500 children are supervised by Headfirst personnel. During recent years, the Company has provided camp and athletic experiences for several thousand youngsters each season.

13.    Sullivan, the founder and President of Headfirst, employed Elwood. Sullivan focused on being the public leader of the organization and on the complex logistical issues of running summer camps for thousands of youngsters. Elwood was the "second in command" of the business under Sullivan. Elwood carried the title Chief Executive Officer and part of his duties was to manage all aspects of Headfirst financial affairs. Elwood acted as a "Chief Financial Officer," and Sullivan had complete and absolute trust in him based upon a 20 year-plus relationship that began in high school in the early 1990s.

14.    In December 2012, Elwood was caught in a massive misappropriation of funds from Headfirst. A series of separate thefts amounted to more than $500,000 over a three-year period. Moreover, Elwood "borrowed" an additional $600,000 from the Company, $400,000 of which was without the knowledge or permission of Sullivan. The thefts, combined with the unauthorized borrowing, depleted available operating cash to such an extent that the November 2012 payroll check of Sullivan was short. When informed by Headfirst's part-time

bookkeeper about the shortage of funds and about Elwood's unauthorized "borrowings" from the Company, Sullivan demanded that Elwood return all the borrowed funds and began to inspect the books. The massive scope of Elwood's serial thefts was then discovered.

      15.   By way of example, an examination of Headfirst's books and records shows that as early as 2007 Elwood stole $19,625.00 to install a hardwood floor in his newly purchased home at 3430 Quebec Street, N.W., Washington, D.C. He disguised the theft by paying for the flooring in six separate credit card transactions using the Headfirst company credit card issued to him as follows:

- Apr. 20, 2007      Universal Floors Inc.      $2,209.00
- May 10, 2007      Universal Floors Inc.      $4,420.00
- July 16, 2007      Universal Floors Inc.      $3,936.00
- July 25, 2007      Universal Floors Inc.      $4,062.00
- Aug. 9, 2007      Universal Floors Inc.      $3,811.00
- Aug. 23, 2007      Universal Floors Inc.      $1,187.00

For each of the six credit card charges to Universal Floors, Elwood explained in the Company's books and records that these costs were "Equipment Expense – Summer Camp." In fact, these Headfirst funds paid for a hardwood floor in Elwood's home.

      16.   By way of further example, five years later in February and March 2012, Elwood purchased with Headfirst funds top-of-the-line appliances for his newly renovated home in Annapolis. The appliances included the following:

- Sub-Zero 42" Side by Side Built in Refrigerator $7,325.58
- Wolf 6 Burner Range             $8,138.98
- Glide Rack                     $  147.00

- Sharp 24" Easy Open Microwave Drawer     $  685.02
- Bosch Stainless Dishwasher     $1,039.78
- Whirlpool Energy Star Front Load Washer     $1,009.40
- Whirlpool Electric Dryer     $  970.20
- Built-In Hood     $  798.70

Elwood engaged in many similar misappropriations over a five-year period until he was caught in December 2012.

14.    Elwood and his wife purchased a personal residence at 3274 Harness Creek Road, Annapolis, Maryland.  The waterfront home was purchased in July 2011 for $1.3 million. Elwood and his wife then renovated the home at an additional cost of approximately $1 million.

15.    In connection with the renovation Elwood used misappropriated funds from Headfirst to pay costs associated with the renovation including, but not limited to, architect fees totaling $27,776.68; engineer fees totaling $7,046.89; and renovation contractor fees totaling $21,291.00 or more.

16.    In addition, Elwood paid for materials and appliances installed in the newly renovated home, including but not limited to, European closets in the amount of $3,520.50, kitchen appliances as listed above with delivery in the amount of $20,541.59 and a 55-inch TV for $1,249.00.

17.    Elwood's spouse joined him in his misdeeds.  For example, Elwood wrote to Ms. Elwood when he instructed her how to disguise the misappropriation of Headfirst funds to purchase the European closets.  He instructed her to tell the vendor that the address on the invoice should be the Headfirst warehouse address at 1818 Margaret Avenue, even though the closets were to be installed at the 3274 Harness Creek Road home.

Ms. Elwood emailed her husband on June 17, 2012 asking:

"What credit card should we use?"

Elwood responded by email the next day as follows:

Use HF . . . only if he will put on the invoice that the
address is:

1818 Margaret Avenue
Annapolis, MD 21401

Just tell him that's the way I want it on the invoice . . . if
he feels funny or asks questions (which he should not),
then please call me.  Call him . . . DO NOT email.

Email me the total cost please charged to the card.

18.   There were more than 400 separate misappropriations, usually disguised on the books and records as having something to do with the Headfirst business.  There were hundreds of false characterizations on the Company's books and records to disguise Elwood's personal expenses.

19.   Over the years, Elwood misused Headfirst company credit cards to pay for personal expenditures large and small.  There was an endless stream of personal charges for items from drugstores, food stores, hardware stores, Home Depot, Amazon.com, restaurants, and others.

20.   The expenses charged to Headfirst even included expenditures made on family vacations to the Cayman Islands ($3,773.21); Las Vegas and other vacation spots in the West ($5,391.91); Rehoboth Beach ($6,148.96); and others.

**On Repeated Occasions Elwood Simply Took Money Directly**

21.   Misappropriation by credit card and check were not the only dishonest means used by Elwood.  For example, on March 19, 2012, he withdrew $40,000 from a branch

of Bank of America in New Jersey.  This was such an extraordinary amount that Elwood wrote

an email to the Headfirst part-time bookkeeper titled "Don't Be Alarmed" (at the high amount of

withdrawal) indicting that the money would be needed later in the year to pay "umpires."  This

was a false statement.  In fact, Headfirst had not paid fees to umpires for several years since the

Company had discontinued the running of baseball leagues and no longer had a need for

umpires.

22.    The next month Elwood withdrew $10,000 cash, again stating on the books

and records of Headfirst that the funds were necessary to pay "umpires."  This too was false.

23.    Elwood also made frequent use of ATMs to withdraw lesser amounts.  In

2012 alone Elwood made many cash withdrawals, usually in amounts of $700.00 or thereabouts,

which was the maximum permitted at any one time.

24.    In years 2010, 2011, and 2012, Elwood stole at least $194,000 in cash alone.

This does not include thefts using credit cards and checks of Headfirst.

**Elwood's Need for Money**

25.    Although Elwood legitimately earned approximately $300,000 in 2011 as an

employee of Headfirst, it was far from enough to support his lifestyle, his separate real estate

business, or the purchase of a waterfront home on the Chesapeake Bay for $1.3 million, much

less to completely renovate that home at an additional cost of approximately $1 million.

Moreover, Elwood invested heavily in the stock market, including purchasing options, which

required considerable funds he did not have.

**Elwood's Real Estate Business – Rental Properties and Personal Residences**

26.    Over time Elwood acquired ownership of numerous rental properties and personal residences.  Elwood and/or Ms. Elwood owned the following properties during the course of their crime spree:

The Rental Properties

- 934 O Street, N.W., Washington, D.C.
- 909 O Street, N.W., Washington, D.C.
- 1403 12th Street, N.W., Washington, D.C.

The Personal Residences

- 3100 Connecticut Avenue Condo, Apartment 109, Washington, D.C.
- 3430 Quebec Street, N.W., Washington, D.C.
- 3274 Harness Creek Road, Annapolis, Maryland

27.    Headfirst funds were used to pay many of the costs associated with the Elwood real estate.

28.    For example, the Quebec Street personal residence property had a hardwood floor installed with $19,625 of funds misappropriated from Headfirst.

29.    The personal residence at 3100 Connecticut Avenue condominium was funded in part with misappropriated funds from Headfirst.  Elwood misappropriated:

- 17 checks to pay the costs of the condo totaling $43,000

- Another check in the amount of $7,187.70 to pay an assessment by the condo board of directors to replace the roof and repair masonry on the condominium

- $1,028.20 to pay for an air conditioning unit in the condo

30.    The Annapolis residence at 3274 Harness Creek Road, Annapolis, Maryland was an extraordinary financial undertaking for Elwood.  He needed to steal, and he and his wife repeatedly used Headfirst funds to pay:

- $3,000 per month ($36,000 total) to the owner of the property Jerry South for a one-year rental of the Harness Creek property prior to purchasing it for $1.3 million

- $21, 291 of Headfirst funds to the renovation company

- $27,776.68 for architectural services

- $7,046.89 for engineering services

- $3,520.50 for European closets to be installed in the home

- $634.94 for a high end vacuum cleaner

- $1,244 to BG&E in connection with damage occurring during the renovation

- $21,018.59 for top of the line kitchen appliances

- $4,800.00 to fix a leaky basement before renovations began

- $1,249.99 for a 55-inch plasma TV for the wall of the newly renovated home

- $3,476 for flood insurance for the home in Annapolis

31. Elwood stole to support his rental properties as well.

- Elwood used Headfirst funds to pay the Waste Management Company $7,647.85 to collect trash over a period of years

- Elwood also paid or loaned $22,035.00 of Headfirst funds to a handyman who worked at the rental properties

## Headfirst Baseball LLC and Headfirst Professional Sports Camps LLC

32.   Headfirst Baseball LLC (Headfirst Baseball) is a company owned by Sullivan and his brother Ted Sullivan. Ted became a member of the Company in 2001, but he only occasionally participates in the business. Ted lives in New York.

33.   Headfirst Camps LLC (Headfirst Camps) is a company owned by Sullivan.

34.   Elwood became a non-equity employee of the business in the early 2000s. He was eventually treated as an equal by Sullivan in terms of compensation and was given the title of Chief Executive Officer. Elwood pressured Sullivan for years for an equity interest in Headfirst. This was discussed on and off for several years, but never culminated in Elwood receiving any equity in Headfirst.

35.   In July 2010, a new separate company was formed in which Elwood was given a 50% ownership. That entity became known as "Headfirst Professional Sports Camps LLC." It was formed for the purpose of running specific summer camps associated with professional baseball teams. The business was basically run by Headfirst personnel. Without disclosure to Sullivan by Elwood of Elwood's serial thefts from Headfirst, Elwood was given a 50% interest in that LLC. Elwood's thefts and cover-up were material to the business of Professional Sports Camps and to Sullivan's agreement to share equity in Headfirst Professional Sports Camps with Elwood.

36.   Still not satisfied, Elwood complained frequently that he did not yet have equity in Headfirst; that he was entitled to equity; and that the failure to provide him with equity was a serious bone of contention in his marriage. In 2011 and 2012, Elwood expressed these concerns verbally and in writing, and negotiations ensued. During this period, Elwood did not disclose his increasing thievery.

11

37.    Sullivan was willing to provide equity in Headfirst but there was a major stumbling block. Sullivan's brother Ted was a 50% owner of Headfirst and was unwilling to give up his equity position entirely. Elwood met with Ted in New York to discuss his demand for equity. Ted was insistent that he (Ted) remain an equity owner but was willing to give up some of his equity under the right circumstances. Ted asked to see the financials of Headfirst, but Elwood made excuses to delay Ted's review of the books and records. As negotiations ensued, Elwood retained counsel to negotiate an equity interest in Headfirst and paid him with Headfirst company funds unbeknownst to Sullivan.

38.    By 2012, Elwood's counsel and Sullivan's counsel worked on drafts of the legal documents which would have granted equity in Headfirst to Elwood. Offers and counteroffers were exchanged. Elwood's counsel submitted the last draft in November 2012 which had a number of material issues that had not been accepted by Sullivan or Ted. In December 2012, equity negotiations abruptly ended when Elwood's unauthorized loans and his thefts were discovered.

### The First Sign of Trouble

39.    In December 2012, the part-time bookkeeper notified Sullivan that Sullivan's December check would be "short" due to a shortage of funds in the Headfirst bank account. That information shocked Sullivan because he had no idea that the Company was low on operating cash. When Sullivan asked why cash was short, the part-time bookkeeper told him that Elwood had borrowed $600,000 from the Company. Sullivan had given Elwood permission to borrow $200,000 in March 2012 and had assumed that the $200,000 was paid back within a few months. Sullivan had no idea that Elwood "borrowed" more than that. Most importantly,

12

Sullivan did not know that Elwood "borrowed" an additional $400,000 without his permission or knowledge.

### Elwood's Role in Headfirst

40.     Elwood handled all the finances for Headfirst.  The part-time bookkeeper reported to Elwood.  Elwood controlled all of the bookkeeper's duties and provided him with complete instructions.  He was responsible for all the checks.  He determined how expenses would be characterized on the books.  He dealt directly with the CPA/Tax Preparer.  He was completely in charge of the Company finances.  He was the de facto CFO.  Elwood performed the role of a typical CFO even though he did not carry the title.

41.     Elwood zealously guarded his control over finances, and he admonished Sullivan to stay out of Headfirst's finances.  For example, on Tuesday, August 23, 2011, Elwood wrote to Sullivan:

| | |
|---|---|
| From: | Rob Elwood |
| Sent: | Tuesday, August 23, 2011 09:23:47 PM |
| To: | Brendan Sullivan |
| Subject: | RE: Check |

Ok B..I love you, but please stop emailing peter about
how to classify or any other matter to do with accounting
and payment etc… I know we already discussed this
today, but it really makes my job tough and more time
consuming and very confusing…I end up having to dig
deep into Quickbook files to see all the things that were
not approved by me, which then effects Anson, which
then makes life hell…I know you get it…but easiest thing
to do is to make sure I get all $$ requests and everyone
else stays out unless I have specific questions…I
think the new form (not ready yet), will help…thanks
Sully.

----------

Rob Elwood
Chief Executive Officer
Headfirst Camps

42.    Sullivan had absolute trust and confidence in Elwood.  They worked closely together for many years running the Headfirst business.  Sullivan even knew Elwood's parents well and knew Elwood's brother.

43.    Elwood was one year older than Sullivan.  Both were pitchers on the same high school baseball team, and both achieved distinction as high school pitchers in Washington, D.C.

44.    Sullivan and Ted are each 50% equity owners of Headfirst Baseball.  Ted never took a salary or shared in the profits of Headfirst Baseball although he did receive compensation for specific days working at some specialized camps known as Honor Roll Camps designed for juniors and seniors in high school who sought the opportunity to play baseball in college.

45.    Sullivan was the leader of the Company, carrying the title of President.  He was the "face" of Headfirst.  Yet, he treated Elwood equally when it came to compensation.

46.    Sullivan's responsibilities lay elsewhere.  Because of his trust in Elwood, Sullivan had little or nothing to do with Headfirst's finances.  He did not inspect the books.  The business was complex and its success depended on the production of a good product, parent confidence, and well-run logistics.  As the "face" of the Company, Sullivan focused on those operational areas of the Company.  He regularly worked long hours in the summer months.

## Sullivan's Initial Review and Discovery of Elwood's Repeated Misappropriation

47.   Immediately upon learning of the unauthorized loan amounts taken by Elwood, Sullivan demanded the immediate return of all "borrowed" funds.  Elwood apologized for taking the funds without permission and promised to return all $600,000 by the end of December.  In fact, the entire amount was returned by Elwood.  This amount was entirely separate from the Headfirst misappropriations/thefts described elsewhere in this Complaint.

48.   In addition to demanding that Elwood return the "borrowed" funds, Sullivan examined the books and records in December 2012 to determine if there was evidence of other Elwood misconduct.  Sullivan had never examined the Company's business records before with a skeptical eye.  The purpose of the initial review of the records was to see if anything "jumped" off the page.  Although Sullivan had never had reason to examine the books before, he now looked at them and determined after several days of work that there were many questionable expenses.

49.   On December 18, 2012, Sullivan wrote an email letter to Elwood and attached a long list of questioned items.  Sullivan was unable to understand why some expenses were identified as "business expenses" since they appeared to have nothing to do with Headfirst's business.  The list of questionable items at first glance totaled about $250,000.

50.   Sullivan asked Elwood to identify each item on the list as either personal or "business related" – and, if an expense was "business related," to explain the business purpose acceptable to the IRS for tax return purposes.

51.   Days passed and Elwood refused to answer fully Sullivan's questions.  He did not identify a single expenditure as a "business expense" nor did he offer any "support" to

explain the questioned expenses.  What he said was that he would pay back about $112,000 of the amount questioned without any specifics.

52.   Based upon Elwood's refusal to respond to the inquiries in Sullivan's letter of December 18, 2012, Elwood was terminated as an employee of Headfirst for theft of company assets.

## Specific Instances of Theft of Company Assets By Elwood

53.   As described in part above, the list of misappropriated funds and personal items/services purchased with Headfirst funds is staggering.  Elwood charged to Headfirst the cost of professionals such as doctors, lawyers, dentists, architects, and engineers.  He charged the costs of renting a home for a year.  He charged part of the cost of renovating the home.  He charged the cost of restaurants and hardware stores and drugstores.  He charged the cost of massages.  He charged the cost of luxurious family vacations to the Cayman Islands, Las Vegas, Rehoboth Beach and other places.  While on these personal vacations he charged various expenses incurred and designated such charges as a "business expense" on the books and records of Headfirst.  Each time, he provided a false/fictitious statement to explain the expense on the books and records so as to hide the true personal purpose of the expense.

## The Amount of Theft Increased Each Year

54.   Elwood essentially "lived off Headfirst" with hundreds of small purchases to support everyday family life – expenses that honest employees pay out of their earnings. Elwood had to steal repeatedly to keep up.

55.   Elwood became more and more brazen over the years.  He learned early that he could steal and get away with it.  For example, no one noticed the hardwood floor he bought in 2007 with Headfirst funds.  It was easy because Elwood had complete control over

Headfirst's finances, check books, credit cards, and bank accounts. He counted on his trusting relationship with Sullivan. He knew that Sullivan would let Elwood run the finances of the Headfirst Companies without supervision or audit. Sullivan focused on providing a quality camp experience and on growing the business, but not on finances. He relied on Elwood to manage the finances and never for one moment questioned him.

56. Elwood also relied on the fact that the Headfirst bookkeeper was a part-time employee. Elwood had total supervisory power over the bookkeeper who reported to him and not to Sullivan. The bookkeeper thought Elwood was honest and he accepted all of his instructions about how to designate expenses and costs. The bookkeeper trusted Elwood just as Sullivan did.

57. Lastly, Elwood kept Headfirst's outside tax preparer in the dark about the details of the business. Headfirst was a small, privately owned business. No audits were performed. The tax preparer was given books and records as created by Elwood, and was not hired to conduct any reviews or audits. The tax preparer had no reason to question the integrity of Elwood, whom he considered a friend. The preparer never contemplated that Elwood would characterize personal expenses as business expenses or would repeatedly make false entries to hide hundreds of separate thefts.

58. Without audits to assure honesty, Elwood was able to steal increasing amounts of money from Headfirst.

59. In 2010, Elwood stole at least $123,000.

60. In 2011, Elwood stole at least $229,000.

61. In 2012, Elwood stole at least $214,000.

62. Headfirst's investigation into how much Elwood stole before 2010 is ongoing.

## The Grandiose Annapolis Renovation Plan – The Final Straw

63. Apparently Elwood thought he was entitled to live as a millionaire. He had amassed several rental properties in downtown Washington. And, he had an ever growing stock portfolio containing mostly Apple stock. He also had the ability to steal at will. But, then Elwood embarked upon a project that would overextend his financial capability to the breaking point and finally take him down – the investment of approximately $2.3 million for a home on Chesapeake Bay.

64. In mid-2010, Elwood and his wife concluded that they would like to move from Washington, D.C. to a quieter community. Ms. Elwood had repeatedly expressed a dislike for Washington, D.C. city life. The decision was made to rent a house on the Chesapeake Bay to see if they liked it.

65. This property was owned by Jerry South, a prosperous businessman who lives next door on Harness Creek Road. Elwood negotiated lease terms with South. The agreement provided for rental of $3,000.00 per month (total $36,000.00) to cover the rental period June 30, 2010 to May 2011.

66. All of these rental payments were paid with misappropriated Headfirst funds. He wrote the first Headfirst check on June 24, 2010 for $6,000, which covered the first month's rent and a security deposit of $3,000. Ten other Headfirst checks were written to Jerry South for $3,000 each. The last of the checks was written on May 1, 2011. Elwood hid the theft by falsely describing the payments on the books and records of Headfirst as "Headfirst consulting work" and "independent contractor payments."

67.     The Elwoods decided to buy the property.  They paid $1.3 million and closed on the house in July 2011.

68.     The property enjoyed magnificent views of the Chesapeake Bay.  However, the Elwoods would undertake renovations including expansion of the structure itself, which would cost them approximately one million dollars above the purchase price.

69.     The plan was essentially to gut the house, expand it to provide more interior rooms and to take advantage of the Bay views.  At completion it would look brand new inside with brand new fixtures, appliances, etc.  The renovation was beautifully done.  Unfortunately, the cost of this project ($1.3 million purchase price plus approximately $1 million in renovation costs) stretched the financial capabilities of the Elwoods to the breaking point.  As a result, Elwood stole more, and more.

70.     Apple stock dropped dramatically in September 2012, which also contributed to Elwood's financial problems.

### Elwood's Early Thefts – Hardwood Floors and Monthly Payments

71.     Elwood stole Headfirst funds in a systematic manner in at least two transactions beginning in 2007.  Available Headfirst records reflect two schemes which facilitated Elwood's theft of large amounts.

72.     In the first scheme, Elwood used Headfirst funds to install a hardwood floor in his private residence at 3430 Quebec Street, N.W., Washington, D.C.  The funds stolen for the hardwood floors, which were installed by Universal Floors, Inc., totaled $19,625.  To pay the amount due Universal Floors, Elwood utilized six separate Headfirst credit card transactions.

73.     Elwood covered up these six credit card transactions by falsely stating on Headfirst books and records that these expenses were for "Equipment Expense Summer Camp"

74.   Each of the six credit card transactions totaling $19,625 were unrelated to Headfirst's business and were personal to Elwood.

75.   In the second scheme, Elwood arranged for 30 checks in the amount of $752.23 each to be paid to him in 30 consecutive months from January 17, 2007 to June 15, 2009.  The total amount of this theft by Elwood from Headfirst Camps was $22,566.90.

76.   Elwood indicated on Headfirst books and records that the purpose for each of these monthly expenditures was "Fuel Reimburse and LOC Parking Spot."

77.   Any business related fuel expenditures by Elwood would have been paid with the Company credit card and would not have been reimbursed on a monthly basis, nor would any actual reimbursement for fuel be identical ($752.23) for 30 months.

78.   These two schemes appear to have set the pattern which Elwood used to steal hundreds of thousands of dollars from Headfirst in subsequent years building to a crescendo in 2012 when he was caught.

## Moving and Storage Company Fees Were Paid With Headfirst Credit Cards

79.   Elwood paid a moving company known as Signature Movers $8,963.50 to move his personal property between Washington, D.C., New Jersey and Annapolis.  All of these costs were personal and not properly charged to Headfirst.

80.   Elwood sold his Quebec Street home in December 2010.  This required that his property be moved to EZ Storage and to his Connecticut Avenue condo which he moved back into temporarily.  In connection with the move from Quebec Street on December 13, 2010 Elwood paid Signature Movers $3,608.50.

81.   A January 2, 2012 charge from Signature Movers in the amount of $2,325.00 was incurred when Elwood moved to New Jersey while renovations were being made

to his Annapolis home.  And, then two more charges were incurred when Elwood moved back from New Jersey to the Annapolis home in September 2012 after renovations had been completed, including a charge of $1.890 on September 12, 2012 and  $1,050 on October 5, 2012.

82.    Elwood paid these charges with Headfirst funds and falsely stated on Headfirst books and records that these costs paid to the moving company were a "facilities expense."

83.    To store personal property during the moves from Quebec Street to the Connecticut Avenue condo, to New Jersey, and finally to the newly renovated home in Annapolis, Elwood entered a contract with EZ Storage to facilitate these moves and the storage of his personal property.  Monthly charges of approximately $538.00 per month were charged to the Headfirst credit card between December 11, 2010 and August 31, 2012.  The total charges to Headfirst were $11,006.52.  Elwood hid these 21 monthly charges by falsely stating on Headfirst books and records that these costs related to "Facilities Expenses."

### Maid Service Provided At Elwood's Quebec Street Home

84.    Ruby Pereira provided maid services at both the Headfirst office and Elwood's private residence on Quebec Street, N.W., Washington, D.C.

85.    Elwood never paid for Ms. Pereira's maid service at his private residence. Instead he paid her $250.00 per week with Headfirst funds.  For this amount Ms. Pereira cleaned both the office and Elwood's Quebec Street house until he moved to New Jersey during the renovations of Elwood's new house in Annapolis.  Forty-eight percent of the $250.00 weekly payment was for cleaning the Quebec Street residence.

86.   Therefore, from January 6, 2009 to February 1, 2011, Elwood stole from Headfirst a total of $6,660.00 to pay Ms. Pereira to clean his personal residence at 3430 Quebec Street, N.W., Washington, D.C.

87.   Elwood indicated on Headfirst books and records that the entire amount of the weekly check ($250.00) was for "Cleaning Services Exp."

88.   Elwood did not disclose that Ms. Pereira was also cleaning his private residence and that Elwood used Headfirst funds to pay that personal expense.

## Condominium At 3100 Connecticut Avenue

89.   Elwood purchased Unit 109 at 3100 Connecticut Avenue as a personal residence in 2002.  He lived there for a number of years until he purchased another home on 3430 Quebec Street, N.W., Washington, D.C. on April 28, 2006.

90.   On August 1, 2011 without the knowledge or permission of Sullivan, Elwood began to pay to himself monthly checks as follows from Headfirst funds:

- Aug. 1, 2011   $2,500
- Sep. 1, 2011   $2,500
- Oct. 1, 2011   $2,500
- Nov. 1, 2011   $2,500
- Dec. 1, 2011   $2,500
- Dec. 30, 2011  $2,500
- Feb. 1, 2012   $2,500

91.   These payments began when Elwood needed to demonstrate to a lender/mortgage holder that this property generated a rental income stream.

92.   In March 2012 this amount changed to $3,000.00.  Beginning in April 2012 the monthly payment increased to $3,750 and Headfirst checks were written to Elwood as follows:

- Apr. 1, 2012   $3,750
- May 2, 2012   $3,750

- June 1, 2012    $3,750
- July 1, 2012    $3,750
- Aug. 1, 2012    $3,750
- Sep. 1, 2012    $3,750
- Oct. 1, 2012    $3,750
- Nov. 1, 2012    $3,750
- Dec. 1, 2012    $3,750

93.    The only connection Headfirst had to this private residence is the following. For the summer of 2012 (June, July and August) a key Headfirst worker, Cray Bony (from Tanzania) lived in the condo while he worked at the St. Albans Summer Camps as a senior person on site.  When Elwood was in D.C., he also stayed in the condo with Bony.

94.    A second employee, Laura Harrigan, used the condo when in Washington for 11 nights, as follows:

- Sep. 17-19, 2012    2 nights
- Oct. 3-6, 2012    3 nights
- Oct. 16-18, 2012    2 nights
- Oct. 29-30, 2012    1 night
- Nov. 14-15, 2012    1 night
- Nov. 27-29, 2012    2 nights
- Dec. 11-13, 2012    2 nights.

95.    If Elwood was entitled to receive rent from Headfirst for the period his condo was used by the two Headfirst employees identified above, he would at most be entitled to 3 months  of reasonable rent, not $54,250.00 over 16 months.  Elwood began stealing the "rental payments" 10 months before Mr. Bony arrived in Washington, D.C.

**Payments For Elwood's Personal Parking Space**

96.    Elwood wanted parking in addition to whatever facilities were available at 3100 Connecticut Avenue, N.W.  The building next door had available parking.  Therefore, Elwood rented a parking space identified as "LL71."

97.    Consistent with Elwood's pattern, Elwood paid the cost of this parking space with Headfirst Funds. This amount covered the rental period for two years – February 25, 2011 to December 1, 2012. To hide this theft of funds paid in 18 separate checks, Elwood stated on the books and records of the Company that the purpose of the payments was "Facilities Expense."

### Maid Service At Elwood's Condo Paid For With Stolen Headfirst Funds

98.    Elwood stole additional Headfirst funds to pay for maid service at his personal condo at 3100 Connecticut Avenue, N.W. Sheila Rosa performed maid services at Elwood's private residence at 3100 Connecticut Avenue, N.W. from March 1, 2011 to September 4, 2012.

99.    During this period Elwood issued 16 checks to Ms. Rosa for a total amount of $1,925. These payments were made with stolen Headfirst funds. Ms. Rosa did not perform any services at the Headfirst office and is unknown to Sullivan. Elwood hid these payments by falsely stating on the Headfirst books and records that the purpose of these payments was "Office Cleaning Expense."

### Elwood Stole Headfirst Funds To Pay For Service/Repairs

100.    In March 2011, Ms. Elwood arranged for service to the door lock at his condo and paid with the Headfirst credit card. The work was performed on the lock and door mechanism of Unit 109. The amount was $429.30.

### Elwood Brought a King Size Mattress With Funds Stolen From Headfirst

101.    On July 25, 2011 Elwood paid Mattress Warehouse $1,961.00 with stolen Headfirst funds for a mattress delivered to his personal condo residence at 3100 Connecticut Avenue, Unit 109. This king size bed was ordered by Ms. Elwood. To cover up this theft

Elwood indicated on the books and records of Headfirst that this purchase of a mattress was for "Equipment Purchase Expense."

### Elwood Paid For An Air Conditioner With Stolen Headfirst Funds

102.  On September 29, 2011 Elwood paid for an air-conditioner for his personal condo residence at 3100 Connecticut Avenue, N.W. with funds stolen from Headfirst in the amount of $1,028.20.  The air-conditioner was ordered by Ms. Elwood.

103.  To cover up this theft and to make it appear to be a legitimate expense of headfirst, he indicated on the books and records that this expenditure was for "Repairs and Maintenance Expense; Heating System Repair."

### Special Assessment To Replace The Roof of the Condo

104.  Elwood stole $7,187.70 to pay for a special assessment by the condo board assessed against all condo owners for roof replacement and masonry restoration.

105.  On June 8, 2012 Elwood issued a check payable to "Cathedral Park Condo" in the amount of $7,187.70.

106.  This was a theft of Headfirst funds to pay condominium obligations which Elwood should have paid personally for Unit 109.

### Headfirst Funds Stolen For Personal Expenses At Personal Residence in Annapolis

107.  Regarding the Harness Creek Road residence, on June 21, 2011, Elwood purchased flood insurance by payment of $3,476 using stolen Headfirst funds.  Insurance was required by Elwood's mortgage lenders.  Elwood covered up this payment by indicating on the books and records that this was an "Insurance Expense."  Of course, the "insurance expense" was not related to the Headfirst business.  Instead it was for Elwood's personal residence in Annapolis.

108.   In June 2011, 3274 Harness Creek Road had a leaky basement which had to be fixed before the renovation work could begin.  Elwood retained the services of Basement Solutions Company.  For these services he paid $4,800 using Headfirst funds with check #4421, dated June 29, 2011.  To hide this misappropriation from Headfirst Elwood falsified the books and records by stating that the purpose of this expenditure was "Repairs and Maintenance Expense Acct" and "AC Heat Waterproof."

109.   While living in the rental, Elwood contracted with architect James Gerrety to develop renovation plans.  While the full cost of the architect's full services are unknown at this time, many of the architect's invoices were paid for with Headfirst funds repeatedly misappropriated by Elwood, including with Headfirst checks totaling $27,776.68.

110.   Each time funds were stolen, Elwood characterized the expenditures falsely on the books and records of Headfirst.  Most times the payments were said to be related to "Facility."  This was a reference to a warehouse leased by Headfirst for storage of equipment.  In fact, none of the invoices related to the storage facility.  All were related to the extensive renovations on the Elwood residence in Annapolis.

111.   Because there were structural changes needed to renovate the home, the expertise of an engineering firm was also required.  The full cost of these services is not known, but it is evident that Elwood misappropriated Headfirst funds to pay at least $7,046.89 of these costs.

112.   Once again, Elwood hid the theft of these funds with false entries on the books and records of Headfirst.  Among the false designations were:  "Facilities Expense" and "Independent Contractor Payments."  Elwood also characterized these payments as "Warehouse

26

enlarge door project," a project which never existed. And, "home office structural addition" which was never known to or approved by Sullivan.

113. Olds Renovations Company was owned and operated by Todd Olds. This company did the actual renovations. The total cost of the renovations performed by the company was $881,000.

114. It is believed that substantial portions of the $881,000 were paid with money orders and cash. Elwood stole large amounts of cash from Headfirst during the period of the renovation. For example, on March 19, 2012 Elwood withdrew $40,000 cash from Bank of America at a New Jersey branch. The next month in April 2012, Elwood withdrew another $10,000. He falsely indicated on the books and records that this was for "Umpires."

115. Meanwhile Elwood withdrew other smaller amounts from ATM machines, often in the amount of $700, apparently the maximum amount of withdrawal at any one time. Sometimes Elwood would take several withdrawals each week to accumulate cash.

116. Ms. Elwood facilitated payments to Olds Renovation using money orders and cash.

117. On occasion, Headfirst checks were used to pay the invoices of Olds Renovation directly. For example, one check #4928 dated March 1, 2012 in the amount of $19,491.00 was paid to Olds. To hide this theft Elwood described this payment as being for "Invoice 1818M," which referred to the address of Headfirst's warehouse rather than his personal residence, where the work was really being done.

118. Other checks were misappropriated from Headfirst to pay Olds for renovations on Elwood's Annapolis home. Elwood continued to hide the theft by mischaracterizing these amounts as being for "Research" or "Research for shed." All of these

designations on the Headfirst books and records were false.  In total, Elwood paid Olds $21,291 using Headfirst checks for work done on his personal residence.

119.  On information and belief, a significant portion of the amounts paid to Olds Renovation Company was paid by money order and/or cash stolen from Headfirst bank accounts or other accounts.

120.  All new, top of the line appliances were purchased for Elwood's Annapolis residence using funds stolen from Headfirst.

121.  The appliances purchased with Headfirst funds totaled $21,018.59.  Two payments were made using Headfirst funds:  a payment of $20,541.59 on February 24, 2012 and a payment of $477 on March 9, 2012.

122.  Elwood falsely stated in the books and records of the Company that these appliances were for "1818 Margaret Warehouse."  Indeed the sales order itself (No. 8525563 dated 2-20-12) listed the "deliver to" address as Headfirst Camps Attn: Rob Elwood, 1818 Margaret Avenue, Annapolis, MD 21401."  This was done to disguise the theft of Headfirst funds.  In fact, the appliances were installed at the Annapolis residence at 3274 Harness Creek Road.

123.  To further hide this theft of Company assets, Elwood wrote an email to the part-time bookkeeper on February 21, 2012 stating:

> "FYI . . . this payment was made today . . . coding is:
>
> 20,541.91 payment made from Bill Pay
> Headfirst Office
> Facility
> Note:  Warehouse Utilities and Furniture"

124.  The appliances paid for by this theft included the following:

- Sub-Zero 42" Side by Side Built in Refrigerator    $7,325.58

- Wolf 6 Burner Range · · · · · · · · · · · · · · · · · · · · · · · · · · · · $8,138.98
- Glide Rack · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · $  147.00
- Sharp 24" Easy Open Microwave Drawer · · · · · · · · · · · · · · · · $  685.02
- Bosch Stainless Dishwasher · · · · · · · · · · · · · · · · · · · · · · · · $1,039.78
- Whirlpool Energy Star Front Load Washer · · · · · · · · · · · · · · · · $1,009.40
- Whirlpool Electric Dryer · · · · · · · · · · · · · · · · · · · · · · · · · · $  970.20
- Built-In Hood · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · $  798.70

125.  A second, smaller purchase was made for a "5 inch riser for Wolf 36" D/F Range" and a "Sub-Zero 88" grille frame for overlay or flush insert" at a total cost of $477.  This time the "deliver to" address was:  "Headfirst Camps: Attn: Rob Elwood, 3274 Harness Creek Road, Annapolis, MD 21403."

126.  Ms. Elwood dealt with ABW Appliance Company.  She ordered this material and she asked her husband to call in the credit card number (of Headfirst) for the second purchase because the company (ABW) did not keep on file the credit card number from the first purchase.  She did not use her personal credit card number for this purchase.

127.  In mid-2012 during the renovation, a contractor caused damage to some BG&E equipment at the 3274 Harness Creek Road, Annapolis home.  This required BG&E personnel to repair the damage and subsequently to bill Elwood $1,244 for the repair services.

128.  BG&E submitted Invoice #6167632755 in the amount of $1,244.

129.  Ms. Elwood dealt directly with BG&E about the repairs.

130.  The $1,244 bill was paid with a Headfirst check dated June 8, 2012. Elwood falsely indicated on the Headfirst books and records that the purpose of this payment to BG&E was "Electrical One Time Warehouse for Certificate of Occupancy."

131. This false entry was to hide the fact that this payment was for repair services performed by BG&E at his personal residence.

132. Two purchases of closets were made as follows from the closet company:

- June 19, 2012  $1,760.25
- July 24, 2012  $1,760.25

133. Ms. Elwood emailed her husband on June 17, 2012 asking:

"What credit card should we use?"

Rob Elwood responded by email dated June 18, 2012 as follows:

Use HF . . . only if he will put on the invoice that the
address is:

1818 Margaret Avenue
Annapolis, MD 21401

Just tell him that's the way I want it on the invoice . . .
if he feels funny or asks questions (which he should
not), then please call me.  Call him on . . . DO NOT
(emphasis in original) email."

Email me the total cost please charged to the card.

134. Ms. Elwood knew that Headfirst funds were used for personal purchases. Moreover, she participated in the falsifying of records to make it appear that this purchase was for use in the Headfirst warehouse at 1818 Margaret Avenue, thus covering up the theft from Headfirst.

148. On September 5, 2012, Elwood misappropriated Headfirst funds in the amount of $1,249.99 to purchase a TV for his newly renovated home in Annapolis.

149. Elwood falsely stated in the books and records of Headfirst that the expense was for the purpose "Technology and Website Expense."

150.  Elwood took further steps to hide this theft by having the TV shipped to a plumbing company located in the same complex as the Headfirst warehouse at 1818 Margaret Avenue, Annapolis.

### Ms. Elwood Paid For A Vacuum Cleaner With Headfirst Stolen Funds

151.  On September 27, 2012 Ms. Elwood purchased a high end Miele vacuum costing $634.94.  She charged this purchase on the Headfirst credit card, and she personally signed the credit card slip.  Elwood has this expense characterized on the Headfirst books as an "Office Supplies Expense."

### Elwood Paid For Furniture With Funds Stolen From Headfirst

152.  On October 4, 2012 to furnish the renovated Annapolis home, Elwood paid to Arhaus Furniture Store $945.94 for household furniture.  He falsely stated on the Headfirst books and records that this expense was for "Office Supplies Expense, Warehouse."

### The New Jersey Thefts

153.  Elwood and family moved to Avon Park, New Jersey – a beach community in January 2012 and lived there for nine months until they moved into the newly renovated Annapolis home.  The family moved to New Jersey for two reasons.  First, Ms. Elwood's mother was in poor health and in fact she died in early 2012.  Second, the million dollar renovation of Elwood's Chesapeake Bay home on Harness Creek Road, Annapolis was to undergo extensive renovations, so extensive that it would have been impossible to live in the home while renovations occurred.

154.  Elwood's move to New Jersey did not cause the ongoing thefts to stop, or to be reduced.  Instead the extent of the thefts increased dramatically.  In fact, Elwood charged to the Headfirst credit card a vast sum of his and his family's daily living expenses.  It appears that

no charge was too small or too large to charge to Headfirst during the nine months or so that his

family was encamped in New Jersey from January 1, 2012 to September 2012.

155.  During the nine months in New Jersey Elwood charged a wide variety of

expenditures, all of which are normal family expenditures and not business related expenses.

156.  By way of summary, Elwood stole from Headfirst by using his Headfirst

credit card to pay for:

- Approximately 50 restaurant outings, including pizza parlors, McDonald's, Subway, Delis and Bars, for family purposes not business purposes.

- Approximately 15-20 trips to the supermarket/convenience stores including Whole Foods, Stop & Shop, Pathway and others.  Many are for amounts such as $245, $119, $163 indicating he was shopping for the family.

- Dunkin Donuts and Starbucks for items large and small.

- Monthly bills for cable TV and personal entertainment services January – September 2012.

- Twenty-five personal health and fitness related costs including many payments to Elwood's chiropractor and for various therapy services.

- Amtrak expenses for his father-in-law Michael Dancisn.

- Twenty-two miscellaneous shopping trips to stores such as Radio Shack, Target, Florist, Home Depot, etc.

- Eighteen trips to a Rite Aid Drug Store.

### Dog Fencing Paid By Elwood With Stolen Headfirst Funds

157.  Elwood rented a New Jersey home near the ocean for nine months while the

Annapolis renovations were underway.  A company known as Johnny on the Spot, which

provided temporary fencing to the Elwoods for their dogs, advertises itself as "Temporary Fencing Experts."

158.  Elwood ordered the installation of a fence for their dog and incurred an installation cost.  Subsequently, there was a monthly rental fee charged by the company.  Elwood paid the entire cost ($841.50) with funds stolen from Headfirst.

159.  Elwood falsely stated on Headfirst books and records that these expenses were for "Portable Toilet Rental."  In fact, the payments were to pay for a dog fence.

### Elwood Used Stolen Headfirst Funds To Support His Real Estate Rental Properties

160.  The Elwoods owned the following rental properties:

- 934 O Street, N.W., Washington, D.C.
- 909 O Street, N.W., Washington, D.C.
- 1403 12th Street, N.W., Washington, D.C.

161.  Elwood contracted with the Waste Management Company to pick up trash at these rental properties and paid a monthly fee.  Over a four-year period (at least) between January 3, 2009 and October 8, 2012, 84 separate payments were made to Waste Management Company.  All of these payments were made with Headfirst funds.  The total amount Elwood stole from Headfirst to pay for these trash pickups was $7,647.85.  These rental properties had nothing to do with Headfirst.  Waste Management did not provide trash service to the Headfirst office.

162.  Elwood falsely stated on the Headfirst books and records that these expenditures were incurred for various reasons among them the following:

- "Property Management"
- "Supplies Exp."
- "Office Supplies Exp."
- "Professional Fees"
- "Utilities Exp."
- "Equipment Purchase Exp."

- "Travel Expense"
- "Automobile Car Allowance Exp."

In fact, these amounts were to pay for the pick-up of trash at rental properties owned by the Elwoods.

163.   Elwood employed Mr. George Hawkins to be the property manager for Elwood's rental properties listed above.  Mr. Hawkins worked for Elwood from February 9, 2009 to September 27, 2010.  Elwood paid Mr. Hawkins with Headfirst funds.  Headfirst checks were issued on 32 separate occasions.  The total amount paid to Mr. Hawkins with Headfirst funds was $22,035.

164.   From time to time Elwood falsely stated the purpose of these expenses as:

- "Property Management"
- "Contract Labor"
- "Advance PMT"

**Family Vacations Paid With Funds Stolen From Headfirst**

165.   Elwood aspired to a lifestyle he could not afford unless he stole from Headfirst.  This is most evident in the purchase and renovation of a Chesapeake Bay shorefront home.

166.   But there is more evidence to underscore Elwood's grandiose lifestyle choices and that is found in the expensive, indeed luxurious, family vacations that he repeatedly enjoyed which were paid for with stolen Headfirst funds.  Headfirst paid for luxurious accommodations such as hotels at beach resorts, transportation, and meals, whether in a fancy restaurant or a pizza shop.  Headfirst funds were used to pay for donuts and coffee, and parking at the beach.  Headfirst also paid for grocery shopping to stock the refrigerator.

167.   Elwood's abuse of trust is also reflected in the amount he stole to pay for the following vacations:

- February 2011 – Cayman Island Vacation     $3,773.21
- April 2011 – Las Vegas/Utah Vacation     $5,391.91
- September 2011 – Maine Vacation     $1,632.91
- Rehoboth Beach Vacation     $6,148.96
- Boston Vacation     $1,300.96

The total amount Elwood stolen to pay for these vacations is $18,247.95.

168.  Consistent with his patterns of providing false descriptions on Headfirst books and records to hide the expenditures, Elwood used many different phony reasons to cover up the vacation spending.  Among the false statements were the following:

- "Cayman Hotel Conference"
- "International Trophy Inc."
- "Meals and Entertainment"
- "Auto Car Allowance"
- "Promotional Handouts"
- "Travel Expense"

169.  The costs above do not reflect the normal cost of plane tickets, because Elwood stole the free air dividend miles which were earned on the Headfirst Visa credit card. The miles were under his personal name and he controlled them.  From time to time the miles were used for business purposes for Elwood and for other Headfirst personnel.  Nonetheless, Elwood hoarded the miles under his own name and he used them at will for himself and his family when travelling unrelated to Headfirst business.  When Elwood was caught in December 2012, it was discovered that he had 750,000 miles on his account, in his own name.

**Elwood Stole $194,000.00 In Cash In Three Years**

170.  Elwood's repeated thefts of cash looted the Headfirst bank account during the years 2010, 2011 and 2012.

171.  Over the 3 years, Elwood stole large amounts on many occasions and smaller amounts on many other occasions.

**$40,000 Of Headfirst Funds Stolen On March 19, 2012**

172.   Elwood's largest single theft occurred on March 19, 2012 when he entered a Bank of America branch in New Jersey and withdrew – in a single transaction – $40,000 (Forty Thousand Dollars).  This was such an extraordinary amount that Elwood felt compelled to write an email to the part-time bookkeeper titled "Don't Be Alarmed."  He stated that the money would be used to pay "umpires" who presumably would umpire league baseball games.  The email read:

> "Made large withdrawal today.  $40,000
> Coding:
> Professional Fees
> Note:  Umpires 2012 Season
> Code it to Headfirst since we will spread this out for
> H Roll and MLB Camps.  We will allocate it later in
> budget based on end of year revenue."

173.   This was false, intended to cover this theft of $40,000.  In fact, Headfirst did not operate baseball leagues at that time, and did not have any need to hire "umpires."

174.   The following month, on April 18, 2012, Elwood stole another $10,000 by withdrawing it from the Headfirst bank account.  Again, falsely stating that it was necessary to pay "umpires for all camps."  And, then on August 2, 2012, he stole another $5,000.  This time the false cover was:  "Facility; grounds crew; miscellaneous; food; per diem."

175.   Elwood did not limit his cash thefts to large amounts like these.  Instead, most of his thefts were taken in smaller amounts so he would not draw suspicion.  His pattern was to withdraw the maximum amount – or near the maximum amount permitted by the ATM machine.  As a result there are many separate thefts in amounts of $700.  Cash withdrawals in 2012 alone amounted to more than $70,000.

176.  In the year 2011, Elwood's pattern of theft of cash was similar to that of 2012.  He stole large amounts on three occasions:

- Feb. 18, 2011     $25,000.00
- May 13, 2011     $10,000.00
- July 20, 2011     $20,000.00

The total cash thefts in 2011 amounted to more than $78,000.00.

177.  And, in 2010 he stole approximately $46,000.00 in cash from the bank accounts of Headfirst.  Among the larger amounts were the following:

- June 22, 2010     $20,000.00
- July  6, 2010     $ 3,855.00
- Aug. 2, 2010     $ 4,000.00
- Aug. 4, 2010     $ 4,000.00

178.  Cash stolen in the three years alone – not counting other thefts via checks and credit cards -- was approximately $194,000.00.

**Elwood Paid for a Leased Vehicle for His Wife and Paid for it With Headfirst Funds**

179.  Headfirst leased vehicles for Sullivan and Elwood.  They were actively running the business on a daily basis.

180.  Elwood's wife was not involved in the business.  She was not authorized to have a leased vehicle.  The fact that she did have one was neither known to, nor approved by, Sullivan.

181.  The lease for Ms. Elwood's Acura began in December 2011 and was terminated after Elwood's wrongdoing was discovered.

182.  Elwood caused payments of $748.21 per month to be made with Headfirst funds.  The total misappropriated was $9,726.73 for the Acura.

**Elwood Paid StubHub With Stolen Headfirst Funds**

183.  On May 31, 2012, Elwood purchased two tickets (Order #54152693) from StubHub for the Stanley Cup Finals game on Saturday, June 2, 2012 between the Los Angeles Kings at New Jersey Devils at a cost of $783.75 of Headfirst money.  Elwood gave the two tickets to Thom Freeman, a relative of Ms. Elwood.

**Elwood's Use of Stolen Headfirst Funds To Pay His Personal Lawyers**

184.  Elwood sought the advice of a Washington, D.C. real estate lawyer for personal matters unrelated to Headfirst. He used a Headfirst credit card on August 2, 2011, to purchase a $500.00 gift certificate to an upscale Washington restaurant.  To hide this theft of Headfirst funds, Elwood described this expenditure as "Supplies" Expense

**Elwood Paid His Corporate Lawyer With Headfirst Funds As Well**

185.  To assist him with the negotiations and legal drafting associated with Elwood's effort to obtain equity in Headfirst, Elwood retained a Washington, D.C. corporate lawyer and paid him fees of $1,500.00 and $950.00.  Elwood characterized these expenses as "Legal Services – Headfirst Office."

**Elwood Paid Still Another Law Firm With Headfirst Funds**

186.  On June 22, 2010, Elwood paid $1,050.00 to a local firm.  Elwood falsely stated the purpose of this expense was "Office Attorney Fees Expense."

**Elwood Used Headfirst Funds To Pay For All Expenses
Incurred To Attend Sullivan's Wedding**

187.  Indicative of their close relationship of 20 years, when Sullivan was married on the Island of Nantucket in September 2012, naturally he invited his close friend and business associate Elwood to the wedding.

188.  Elwood paid his expenses to attend the wedding by using the Headfirst credit card.  Among the charges was lodging at the Seven Sea Street Inn in the amount of $901.42.  Other charges included dinner, the cost of the ferry and the cost of parking at BWI Airport ($82.00) at the end of the weekend.

189.  A mutual friend of Sullivan and Elwood stayed with Elwood at the Inn. That friend gave Elwood some cash to pay for his share of the cost of staying at the Inn.  Elwood pocketed that cash and thus made money on the wedding.

### Ms. Elwood's Complicity in Elwood's Dishonest Scheme

190.  Ms. Elwood used Headfirst funds to pay personal bills on many occasions.

191.  Ms. Elwood used the Company credit care to make payments to BG&E, European Closets, Arhaus Furniture, Bray & Scarff, Capital Vacuum, Mattress Warehouse, and a Locksmith.

192.  Ms. Elwood signed her husband's name to at least one Headfirst check, which Elwood acknowledged in an email to Headfirst's bookkeeper.

193.  Ms. Elwood drove an Acura leased by Headfirst in 2011.

194.  Ms. Elwood lived at 3274 Harness Creek Road, Annapolis, Maryland for one year in which Headfirst paid $3,000 per month; $36,000 per year and the family paid nothing.

195.  Ms. Elwood was told in an email by her husband to have European Closets shipped to an address not her home address and not to put such a direction in an email.

196.  Ms. Elwood knew that some renovation bills were paid via money order – the only purpose of which is to hide cash.

197.  Ms. Elwood knew that cash was used to pay for renovations and on at least one occasion, went to Bank of America to get cash to pay a renovation bill with that cash.

198.  Ms. Elwood went on family vacations and it appears that she did not use a personal credit card to pay for any of those vacations or anything related to the vacations.

199.  Ms. Elwood lived in New Jersey for nine months during the renovations on the Annapolis home and she knew that virtually every family expense was paid for with a Headfirst credit card.

200.  Ms. Elwood knew her husband had no equity in Headfirst and she was very mad about it.

201.  Ms. Elwood knew, or should have known, that their standard of living far exceeded their annual income; and that their annual income could not support:

- Investment rental property in downtown D.C.
- The 3100 Connecticut Avenue condo
- An investment portfolio of $1.3 million in stock – prior to the stock fall in September 2012
- A new leased car
- Expensive vacations
- A $1.3 million home on Chesapeake Bay
- And, approximately $1 million of renovations to that home.

202.  There are additional thefts not specifically enumerated herein, and it is anticipated that additional thefts will be uncovered in the future.  In addition, plaintiffs have suffered and will suffer consequential damages as a result of Defendants' thefts such as accounting fees, consulting fees, tax amendment fees, legal fees and lost business opportunities.

**Converted Property and Records**

203.  Elwood unlawfully possesses the following property of Headfirst that he refuses to return.

- iPad wifi 4G (purchased on October 2, 2012 using a Headfirst account)

Number 2028033318
IMEI#: 013116006970056
SIM#: 8901410325511958235

- iPhone 5 (purchased on October 2, 2012 using a Headfirst account)
  Number 2024397617 (Rob Elwood cell phone number)
  IMEI# 013328000431551
  SIM #: 89014103255621643058
- iPhone 5 (purchased on October 2, 2012 using a Headfirst account)
  Number 70394666988
  IMEI#: 013335006774777
- iPad (version unknown) (purchased using a Headfirst account and first used on May 2012)
  IMEI#: 012930002366238
  iPad 2024304265 – 15 GB wifi 3G / SIM # 89014101255091754937
  iPad 2024312654 – 15 GB wifi 3G / SIM # 89014101255091754929
  iPad 2024318993 – 15 GB wifi 3G / SIM # 89014101255091755116
- Mac laptop computer used by Rod Elwood (purchased using Headfirst funds)
- Mac laptop computer used by Ms. Elwood (purchased using Headfirst funds)
- Mac Desktop computer used by Elwood family (purchased using Headfirst funds)
- Two Zagg keyboards purchased with Headfirst funds
- Printers purchased by Headfirst for home, home office or warehouse
- Video camera used by Elwood during summer 2012 (purchased by Headfirst)
- Neuberger Company (sales training) materials
- A bound book of all Headfirst curriculums (prepared by Helen Craig)
- A bound book of all "SOP's" [Standard Operating Procedures]
- Multi-Sport Camp and other camp curriculum copies – both hard and soft (digital) versions
- Headfirst training materials, counselor and leadership team manuals
- Training videos
- Video footage taken during summer 2012
- Chicago Cubs camp training footage shot by Automatic Sports in August 2012
- Other video footage belonging to Headfirst Camps, LLC and/or Headfirst Professional Sports Camps, LLC
- Accounting records

### Conclusion

204.  Elwood and Ms. Elwood were engaged in a frenzy of stealing.  The Elwoods

benefited from their stealing binge which included hundreds of separate thefts large and small.

Headfirst funds were used to pay for just about everything, including, but not limited to:

- Architects
- Engineers
- Wife's Car
- Furniture
- Appliances
- Built-In Closets
- BG&E Repairs
- A Household Vacuum Cleaner
- A Plasma TV
- Cable Fees
- Moving Company Fees
- Storage Fees
- Luxurious Vacations
- Meals
- Travel
- Entertainment
- Groceries
- Drugstore Items
- Restaurants
- iPhones
- iPads
- Medical Costs
- Music
- Bose Sound Systems

205.  Elwood stole, with his wife's knowing assistance, cash to build up  a cash

reserve.  They used some to pay bills.  Some they converted to money orders and then paid bills.

In 3 years (2010, 2011, 2012) Elwood stole $194,000 in cash alone.

206.  By the beginning of December 2012, Headfirst was left with insufficient

funds to operate the business.  Elwood tried to solve this problem by arranging for a line of credit

at Bank of America for $300,000.  In fact, Sullivan and Ted (the Owners) were required to sign

for the line of credit. This line of credit was needed only because Elwood had $600,000 of Headfirst money then stashed in his own personal bank account to facilitate various personal mortgages and other borrowings. Once the line of credit was approved and put into place by Bank of America, Elwood immediately drew the entire amount down so that Headfirst would have funds available to operate its business on a daily basis.

207. Then, by the first week of December 2012, Elwood made his fatal mistake. He had stolen so much that the $300,000 line of credit was not enough. There was not enough money in Headfirst accounts to pay the full payroll due in December. This situation caused the part-time bookkeeper to inform Sullivan for the first time that his (Sullivan's) monthly draw check would be short. That disclosure prompted Sullivan to ask: Why are we short of funds? The bookkeeper then informed Sullivan that Elwood had withdrawn from the Headfirst bank account "short term loans" in the amount of $600,000. Sullivan was shocked. He had known about a $200,000 loan requested by Elwood and gave him permission to borrow that amount in March 2012 expecting it to be repaid within a few months. Sullivan did not know, nor did he give permission for Elwood to borrow an additional $400,000. Sullivan confronted Elwood and told him to return all funds immediately.

208. Elwood apologized profusely and agreed to return the entire $600,000 within a few weeks. He acknowledged in writing that he owed the entire $600,000 to Headfirst. Within three weeks of being discovered he did return the entire amount. Return of those funds permitted Headfirst to pay down the $300,000 line of credit and to have sufficient funds to carry on normal operations.

209. Because of these events, Sullivan, for the first time, doubted the trustworthiness of Elwood whom he had known for 20 plus years.

210. Even though Sullivan and his brother Ted owned Headfirst, Sullivan treated Elwood equally when it came to compensation even though Elwood did not have any equity. Ted was not involved in the day-to-day running of the business and did not receive a salary or draw. Lack of equity became a bone of contention with Elwood. Indeed, he pressed hard to be given equity in Headfirst. By 2012, Elwood emailed and verbalized his concerns that he was not given the equity he believed he deserved. By mid-2012, Elwood retained personal counsel (paid for with Headfirst funds unknown to Sullivan) to negotiate and to review documents that would have provided him with equity if material differences could be ironed out.

211. Elwood's serial thefts were discovered in early December 2012 before those negotiations were completed and before any documents were signed.

212. As a result, on December 28, 2012 Sullivan advised Elwood in writing that he was terminated effective December 31, 2012.

213. Subsequently, in January, February, March and April of 2013, further analysis of Headfirst books and records revealed the breadth and scope of Elwood's thefts as described here. It is now documented that Elwood stole at least $550,000.

214. Elwood falsified the books and records of Headfirst to hide his thefts. But he mostly relied on the fact that his 20-plus-years friendship with Sullivan would give Elwood complete autonomy in managing the financial affairs of Headfirst. Elwood portrayed himself as extremely cost conscious. He had a reputation as a penny pincher. He complained if others were not similarly concerned. In fact, Elwood was a thief; he engaged in serial thefts designed to drain from Headfirst bank accounts all available funds to satisfy his unquenchable need for money. Elwood used the stolen funds to pay for a lifestyle otherwise not within his reach; and to fund his investments in Apple stock and his rental real estate properties.

215. Absent the impressive success and financial stability of Headfirst, Elwood's misconduct could have seriously harmed the Company. As it turns out, Headfirst was stable enough that it was able to survive Elwood's extensive thefts.

## Count I – Conversion

216.  Plaintiffs Headfirst Camps and Headfirst Baseball hereby incorporate paragraphs 1 through 215 as though fully set forth herein.

217.  Through his actions described above, while under the employ of Headfirst, Elwood stole and unlawfully converted money rightfully belonging to Headfirst.

218.  Through her actions described above, Ms. Elwood participated in the theft of money rightfully belonging to Headfirst and also converted money rightfully belonging to Headfirst.

219.  Through his actions described above, Elwood illegally converted property belonging to Headfirst.

220.  Headfirst has suffered damages in excess of $550,000.00 as a direct and proximate result of this conversion.

## Count II – Constructive Trust

221.  Plaintiffs Headfirst Camps and Headfirst Baseball hereby incorporate paragraphs 1 though 215 as though fully set forth herein.

222.  On information and belief, the following properties were purchased and improved by Elwood and Ms. Elwood using funds stolen from Headfirst.

- 3100 Connecticut Avenue
  Apt. 109
  Washington, DC
  (Elwood)

- 3274 Harness Creek Road
  Annapolis, MD
  (Elwood and Ms. Elwood)

223.  Because they were purchased and improved using funds stolen from Headfirst, Headfirst Camps and Headfirst Baseball seek a declaration that these properties by operation of law are held in constructive trust for the entities' benefit up to the amount of stolen funds used to purchase and improve them.

### Count III – Breach of Fiduciary Duty

224.  Plaintiffs Headfirst Camps and Headfirst Baseball hereby incorporate paragraphs 1 through 215 as if set forth fully herein.

225.  As an employee of Headfirst, Elwood owed a fiduciary duty to Headfirst.

226.  By repeatedly stealing from Headfirst, Elwood breached his fiduciary duty to Headfirst Camps and Headfirst Baseball.

### Count IV – Fraud in the Inducement

227.  Plaintiff Sullivan hereby incorporates paragraphs 1 through 215 as if set forth fully herein.

228.  In 2010, Sullivan formed a new company that became known as Headfirst Professional Sports Camps LLC for the purpose of running camps in conjunction with professional baseball clubs.  Elwood induced Sullivan to provide Elwood a 50 percent membership in the LLC.

229.  Before and during the formation of Headfirst Professional Sports Camps LLC, Elwood had a duty to inform Sullivan that he had been stealing hundreds of thousands of dollars from Headfirst.  He did not do so.  Instead, Elwood created false financial statements on which Sullivan reasonably relied.

230.  If Sullivan had known that Elwood was systematically stealing from Headfirst and misrepresenting expenses on the books and records to cover up his thefts, Sullivan

47

would not have agreed to provide Elwood a 50 percent membership in Headfirst Professional Sports Camps LLC.

231. Thus, Elwood fraudulently induced Sullivan to provide Elwood a 50 percent membership in Headfirst Professional Sports Camps LLC. Elwood's membership in the company therefore should be declared null and void.

## Count V – Tortious Interference

232. Plaintiffs Headfirst Baseball and Headfirst Camps incorporate paragraphs 1 through 215 as if fully set forth herein.

233. Elwood has tortiously interfered with the Headfirst business and its contracts with third parties.

234. Elwood's interference has caused damage to Headfirst.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays that this Court enter a judgment:

a. Awarding Headfirst Camps and Headfirst Baseball compensatory damages against Defendant Elwood in an amount to exceed $550,000;

b. Ordering Elwood to return the property and records of Headfirst Camps and Headfirst Baseball that he converted;

c. Awarding plaintiffs punitive damages against Defendant Elwood in an amount to be determined;

d. Imposing a constructive trust on the real estate purchased and improved with stolen funds;

e. Ordering Elwood to cease and desist from interfering with the business and contractual relationships of Headfirst Camps and Headfirst Baseball.

    f.   Awarding plaintiffs the reasonable and necessary attorneys fees incurred in the prosecution of this action;

    g.   Awarding plaintiffs prejudgment and post-judgment interest;

    h.   Awarding plaintiffs all reasonable costs of this action; and

    i.   Awarding plaintiffs such other just and equitable relief as this court deems proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.


Respectfully submitted,

WILLIAMS & CONNOLLY LLP


/s/ Michael S. Sundermeyer
Michael S. Sundermeyer (DC Bar #931873)
Robert M. Cary (DC Bar #431815)
Simon A. Latcovich (DC Bar #980319)
725 12th Street, N.W.
Washington, DC  20005
(202) 434-5000

Attorneys for Plaintiffs
Headfirst Camps LLC, Headfirst Baseball
LLC, and Brendan V. Sullivan III


Dated:  April 21, 2013