**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

HEADFIRST BASEBALL LLC, <u>et al.</u>,  )
)
        Plaintiffs,  )
)
    v.  )
)
ROBERT ELWOOD,  )
)
        Defendant.  )
_____)
ROBERT ELWOOD,  )
)
        Counterclaim Plaintiff,  )
)
v.  )     Civil Action No. 13-536 (RBW)
)
BRENDAN V. SULLIVAN III, <u>et al.</u>,  )
)
        Counterclaim Defendants.  )
_____)
HEADFIRST PROFESSIONAL SPORTS,  )
CAMPS LLC,  )
)
        Counterclaim Plaintiff,  )
)
    v.  )
)
ROBERT ELWOOD,  )
)
        Counterclaim Defendant.  )
_____)

## <u>MEMORANDUM OPINION</u>

This civil case, which involves a myriad of claims and counterclaims asserted by multiple

parties, including two former friends and business associates, is nearing its resolution, following

the first half of a bifurcated jury trial on the issue of liability with respect to each claim and

counterclaim, with the damages phase of the trial scheduled to commence on March 28, 2017.

Currently pending before the Court are three inter-related motions that will determine which

claims remain for the damages phase of trial.  <u>See generally</u> Headfirst Professional Sports Camps

LLC's Motion for Judgment and Proposed Findings of Fact and Conclusions of Law, ECF No.

244 ("Headfirst Prof'l's Mot."); Elwood's Motion for Judgment on Partial Findings as to

Headfirst Professional Sports Camps LLC's Counterclaim and Memorandum in Support, ECF

No. 222 ("Elwood's Rule 52 Mot."); Brendan Sullivan III and Headfirst Professional Sports

Camps LLC's Motion for Judgment as a Matter of Law Regarding Damages, ECF No. 246 ("Pls'

Damages Mot.").  Upon careful consideration of the parties' submissions,[1] the Court concludes

that Headfirst Professional Sports Camps LLC's ("Headfirst Professional") motion for judgment

and Elwood's Rule 52 motion must be granted in part and denied in part, and that Brendan

Sullivan and Headfirst Professional's motion regarding damages must be granted.

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) Headfirst Professional Sports Camps LLC's Proposed Findings of Fact and Conclusions of Law, which is attached as Exhibit A to Headfirst Professional's Motion ("Headfirst Prof'l's Proposed Findings"); (2) Elwood's Memorandum in Opposition to Headfirst Professional Sports Camps LLC's Motion for Judgment and Proposed Findings of Fact & Conclusions of Law ("Elwood's Opp'n to Headfirst Prof'l's Mot."); (3) the Reply in Support of Headfirst Professional Sports Camps LLC's Motion for Judgment and Proposed Findings of Fact & Conclusions of Law ("Headfirst Prof'l's Reply"); (4) Headfirst Professional Sports Camps LLC's Opposition to Elwood's Motion for Judgment on Partial Findings Under Rule 52 ("Headfirst Prof'l's Opp'n to Elwood's Rule 52 Mot."); (5) Elwood's Opposition to Brendan Sullivan III and Headfirst Professional Sports Camps LLC's Motion for Judgment as a Matter of Law Regarding Damages ("Elwood's Opp'n to Pls.' Damages Mot."); (6) the Reply in Support of Brendan Sullivan III and Headfirst Professional Sports Camps LLC's Motion for Judgment as a Matter of Law Regarding Damages ("Pls.' Damages Mot. Reply"); (7) Brendan V. Sullivan III and Headfirst Professional Sports Camps LLC's Supplemental Brief Regarding <u>Beacon Theatres v. Westover</u> ("Pls.' Supp. Mem."); (8) the Supplemental Memorandum Regarding <u>Beacon Theatres v. Westover</u> in Further Opposition to Sullivan and Headfirst Professional Sports Camps LLC's Motion for Judgment as a Matter of Law Regarding Damages ("Elwood's Supp. Mem."); (9) Brendan V. Sullivan III and Headfirst Professional Sports Camps LLC's Reply Supplemental Brief Regarding <u>Beacon Theatres v. Westover</u> ("Pls.' Supp. Reply"); (10) the Counterclaim Against Brendan V. Sullivan III and Headfirst Professional Sports Camps LLC ("Elwood's Countercl."); (11) Headfirst Professional Sports Camps LLC's Answer, Affirmative Defenses, and Counterclaim to the Counterclaim Submitted by Robert Elwood ("Headfirst Prof'l's Countercl."); (12) Elwood's Motion for Leave to File Second Amended Complaint Against Sullivan and Headfirst Professional Sports Camps LLC and Memorandum in Support ("Elwood's Mot. to Amend"); (13) the Transcript of the February 2, 2017 Motions Hearing, ECF No. 278 ("Feb. 2, 2017 Hearing Tr."); (14) the Transcript of the December 9, 2016 Status Conference ("Dec. 9, 2016 Hearing Tr."); (15) the various trial transcripts generated in this case, which will be cited herein in the following format: "[date] [AM/PM] Trial Tr."; and (16) the jury's Verdict Form.

## I.   BACKGROUND

The Court's detailed findings of fact are set forth herein, <u>infra</u> Part III.A.1; however, for purposes of resolving the several pending motions, an overview of the history of this dispute prior to this Court's involvement, and a summary of the jury's verdict in the liability phase of the trial, are useful.

### A.   Proceedings in Superior Court

On May 3, 2013, Headfirst Professional filed a lawsuit against Robert Elwood ("Elwood") in the Superior Court of the District of Columbia ("Superior Court"), which included a motion for a preliminary injunction.  <u>See</u> Docket Sheet, <u>Headfirst Professional Sports Camps LLC v. Robert Elwood</u>, Case No. 2013 CA 003108 B.  On July 10, 2013, Headfirst Professional voluntarily dismissed that lawsuit, and simultaneously filed a new lawsuit in the Superior Court, but did not seek injunctive relief in the new case.  <u>See</u> Docket Sheet, <u>Headfirst Professional Sports Camps LLC v. Robert Elwood</u>, Case No. CA 004682 B; Feb. 2, 2017 Hearing Tr. at 25:2–4.[2]

Meanwhile, Brendan Sullivan III ("Sullivan"), Headfirst Camps LLC ("Headfirst Camps"), and Headfirst Baseball LLC ("Headfirst Baseball"), initiated this lawsuit against Elwood on April 21, 2013.  Complaint, ECF No. 1 (Apr. 21, 2013).  Elwood then filed a counterclaim against Sullivan and Headfirst Professional, thus bringing Headfirst Professional into this lawsuit as a party.  <u>See generally</u> Elwood's Countercl.  The Superior Court case initiated by Sullivan and Headfirst Professional was stayed and has remained in that status pending the

---

[2] The Court takes judicial notice, as it can, of the Superior Court proceedings.  <u>See, e.g.</u>, <u>Dupree v. Jefferson</u>, 666 F.2d 606, 608 n.1 (D.C. Cir. 1981) (noting that the court has the "authority to judicially notice related proceedings in other courts").

resolution of the parties' dispute in this Court.  <u>See</u> Docket Sheet, <u>Headfirst Professional Sports</u>

<u>Camps LLC v. Robert Elwood</u>, Case No. CA 004682 B.

**B.      The Jury's Liability Phase Verdict**

Of utmost relevance to the resolution of the pending motions are the following jury

findings: First, the jury found in favor of Elwood on his claim that a Headfirst partnership

existed between him and Sullivan and that each owns a 50% share in that partnership.  Verdict

Form (Questions 3 & 4 and the jury's verdict).  The jury also found that by excluding Elwood

from managing Headfirst Professional in December 2012, Sullivan and Headfirst Professional

breached their obligations owed to Elwood under the Headfirst Professional operating

agreement.  <u>Id.</u> (Questions 10 & 11 and the jury's verdict).  However, the jury determined that

Elwood's conversion of Headfirst Baseball's and Headfirst Camps' funds, which occurred prior

to Elwood's termination, constituted a breach of the Headfirst Professional operating

agreement's implied covenant of good faith and fair dealing.  <u>Id.</u> (Question 12 and the jury's

verdict).  Finally, the jury also concluded that Sullivan and Headfirst Professional violated the

District of Columbia Limited Liability Company Act by excluding Elwood from the

management of Headfirst Professional.  <u>Id.</u> (Questions 13 & 14 and the jury's verdict).

**II.      STANDARDS OF REVIEW**

**A.      Rule 50 Motions**

Pursuant to Federal Rule of Civil Procedure 50(a), the Court may grant a motion for

judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary

basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  "[A] court may not assess the

credibility of witnesses or weigh the evidence" when considering such a motion, <u>Hayman v.</u>

<u>Nat'l Acad. of Scis.</u>, 23 F.3d 535, 537 (D.C. Cir. 1994), and the Court must consider the

evidence in the light most favorable to the non-moving party, see McGill v. Munoz, 203 F.3d

843, 845 (D.C. Cir. 2000) ("Judgment as a matter of law is appropriate only if 'the evidence and

all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and

women could not' have reached a verdict in [the non-moving party's] favor." (quoting Duncan v.

Wash. Metro Area Transit Auth., 201 F.3d 482, 485 (D.C. Cir. 2000))).

> That is not to say, however, that a mere scintilla of evidence will defeat a Rule 50
> motion. "The question is not whether there is literally no evidence supporting the
> party against whom the motion is directed but whether there is evidence upon which
> the jury might reasonably find a verdict for that party."

Robinson v. Wash. Metro. Area Transit Auth., 941 F. Supp. 2d 61, 67 (D.D.C. 2013) (quoting

9B Wright & Miller, Federal Practice and Procedure § 2524 (3d ed. 2008)), aff'd, 774 F.3d 33

(D.C. Cir. 2014).

### B.     Rule 52 Motions

Federal Rule of Civil Procedure 52 provides that

> [i]n an action tried on the facts without a jury or with an advisory jury, the court
> must find the facts specially and state its conclusions of law separately. The
> findings and conclusions may be stated on the record after the close of the evidence
> or may appear in an opinion or a memorandum of decision filed by the court.

Fed. R. Civ. P. 52(a).  Further,

> [i]f a party has been fully heard on an issue during a nonjury trial and the court
> finds against the party on that issue, the court may enter judgment against the party
> on a claim or defense that, under the controlling law, can be maintained or defeated
> only with a favorable finding on that issue.

Fed. R. Civ. P. 52(c).  "A judgment on partial findings must be supported by findings of fact and

conclusions of law as required by Rule 52(a)."  Id.  "In its determination of a motion made in

accordance with Rule 52(c), 'a district court may not draw any special inferences in favor of the

non-movant'; rather, 'the court must weigh the evidence, resolve any conflicts in it, and decide

where the preponderance lies.'"  Burke v. Record Press, Inc., 951 F. Supp. 2d 26, 31 (D.D.C.

2013) (quoting <u>United States ex rel. Ervin & Assocs. v. Hamilton Sec. Grp.</u>, 298 F. Supp. 2d 91, 92–93 (D.D.C. 2004)).

### III.   ANALYSIS

**A.   Headfirst Professional's Rule 52(a) and Elwood's Rule 52(c) Motions**

**1.   Findings of Fact**

The evidence adduced at trial established the following: Elwood and Sullivan are each members and 50% owners of Headfirst Professional, which was formed on July 16, 2010.  PX-0112.001, .017.  Sullivan and his brother Edward ("Ted") Sullivan are the sole co-owners and members of two other limited liability companies, Headfirst Baseball, which was formed in 1997, and Headfirst Camps, which commenced operations in 2012.  Nov. 8, 2016 PM Trial Tr. at 11:3–5, 27:10–29:25, 61:14–64:2 (Sullivan's testimony describing the two companies).

For several years prior to December 2012, Elwood made purchases with and withdrawals of Headfirst Baseball's and Headfirst Camps' funds for personal purposes that were not authorized by Sullivan or his brother, Ted Sullivan.  <u>See, e.g.</u>, Nov. 10, 2016 AM Trial Tr. at 31:11–24 (Sullivan summarizing $43,000 in unauthorized rental payments); <u>id.</u> at 55:15–57:9 (Sullivan describing $33,850 in unauthorized payments made to Elwood's personal handyman); <u>id.</u> at 74:21–75:15 (Sullivan describing over $98,000 in unauthorized payments related to Elwood's Naylor Court property).  Sullivan testified that Elwood concealed his unauthorized purchases and loans by making false entries into Headfirst Baseball's and Headfirst Camps' books and records.  <u>See, e.g.</u>, Nov. 10, 2016 AM Trial Tr. at 138:16–141:15 (Sullivan describing Elwood's purchase of personal entertainment tickets from StubHub and his instructions to the company's bookkeeper to record, or "code," the purchase as a business expense for promotional materials).  Elwood maintained at trial that he believed he was authorized pursuant to an

agreement he had with Sullivan to use Headfirst Baseball's and Headfirst Camps' funds for personal expenses, see Nov. 16, 2016 PM Trial Tr. at 23:1–21, but the jury rejected his testimony and found Elwood liable for the unlawful conversion of those funds, see Verdict Form (Questions 1 & 2 and the jury's verdict).

During 2012, Elwood also made several loans to himself totaling $600,000 from Headfirst Camps, although Sullivan had authorized only a single $200,000 loan.  See Nov. 8, 2016 PM Trial Tr. at 89:9–91:3 (Sullivan reciting a March 2012 email in which Elwood asked for a $200,000 short-term loan and testifying that he, Sullivan, did not authorize any other loans to Elwood in 2012); Nov. 9, 2016 AM Trial Tr. at 10:6–15 (Sullivan's testimony that he was not aware that Elwood had borrowed $600,000).  Elwood subsequently repaid the $600,000, Nov. 9, 2016 AM Trial Tr. at 42:13–14; however, while Elwood still had the $600,000 loan outstanding during the fall of 2012, he persuaded Sullivan and Ted Sullivan to obtain a $300,000 line of credit from Bank of America to enable Headfirst Camps and Headfirst Professional to pay bills and make payroll, see Nov. 28, 2016 AM Trial Tr. at 51:13–84:12 (Elwood's testimony regarding a series of events culminating in a $300,000 line of credit being provided to pay outstanding invoices and payroll).

Sullivan first learned about Elwood's unauthorized expenditures in November 2012, after a conversation with the company's bookkeeper alerted him to Elwood's unauthorized loans. Nov. 9, 2016 AM Trial Tr. at 26:6–24.  Sullivan confronted Elwood about the unauthorized loans on December 1, 2012.  Id. at 33:21–34:21 (Sullivan recounting a telephone conversation with Elwood regarding the $600,000 loan).  A further investigation uncovered Elwood's credit card purchases.  Id. at 50:14–52:16 (Sullivan's testimony about a letter he sent to Elwood regarding Sullivan's investigation of Elwood's credit card purchases).  After receiving an

unsatisfactory response from Elwood about his expenditures, id. at 54:8–55:14 (Sullivan stating that Elwood never explained the credit card charges about which Sullivan confronted him in December 2012), Sullivan terminated Elwood's relationship with all Headfirst companies, including Headfirst Professional, on December 28, 2012, effective December 31, 2012, id. at 57:15–59:1.  Sullivan testified that he took this action because he believed that Elwood's thefts constituted a violation of the "morals clause" contained in the agreement between Headfirst Professional and the Red Sox major league baseball organization, which would have permitted the Red Sox organization to terminate its contract with Headfirst Professional.  Nov. 15, 2016 AM Trial Tr. at 144:5–145:2 (Sullivan's testimony regarding his understanding of the "morals clause" in Headfirst Professional's contract with the Red Sox organization).  Sullivan admitted, however, that the Headfirst Professional operating agreement did not authorize him to terminate Elwood's membership in the company.  See id. at 16:19–23 (Sullivan's testimony that he could not identify a provision in the operating agreement allowing him to terminate Elwood as a member of Headfirst Professional).

Thereafter, in April 2013, Elwood caused Headfirst Professional's camper registration website to be shut down for several days.  Nov. 14, 2016 PM Trial Tr. at 86:10–87:18, 91:9–10 (Sullivan's testimony describing the circumstances culminating in the freezing of the registration website).  However, it was not typical for any Headfirst employee to access registered campers' information until the day before or the same day summer camps began in the month of June. Nov. 22, 2016 PM Trial Tr. at 24:12–26:6 (Elwood's testimony regarding Headfirst camp procedures).  Also in April 2013, Elwood exchanged communications with Bank of America that resulted in that institution freezing Headfirst Professional's bank account, which at the time contained $600,000.  Nov. 14, 2016 PM Trial Tr. at 77:4–79:3 (Sullivan's testimony describing

the freezing of Headfirst Professional's Bank of America account); see also Nov. 22, 2016 PM

Trial Tr. at 27:11–19.  The funds in that account were therefore inaccessible for approximately

two months between April and June 2013, Nov. 14, 2016 PM Trial Tr. at 80:13–15, and the

account was unfrozen only after Sullivan agreed to hold Bank of America harmless from any

claims Elwood might pursue against it, id. at 80:5–12.  Finally, in August 2013, Elwood deprived

Headfirst Professional of its access to its Google AdWords account, an advertising tool Headfirst

Professional used to recruit potential campers.  Id. at 55:7–58:11, 62:20–71:3 (Sullivan

describing the function of the Google AdWords account, the changes made to the account in

August 2013 that shut off Sullivan's access to the account, and Sullivan's efforts to regain

access).  Elwood testified that in taking these actions, he "was simply trying to accomplish and

exercise [his] right as a manager and member of [Headfirst Professional]."  Nov. 22, 2016 PM

Trial Tr. at 28:9–10.

### 2.   Conclusions of Law

#### a.   Headfirst Professional's Request for Injunctive Relief

Elwood argues that Headfirst Professional's breach of fiduciary duty and breach of

contract claims fail to provide a basis for the relief requested because there is no evidence that

Headfirst Professional has made the requisite showing of harm or injury resulting from either

claim, or that it has suffered or will suffer any irreparable injury that would justify the entry of

injunctive relief.  See Elwood's Opp'n to Headfirst Prof'l's Mot. at 4–15.[3]  Headfirst

Professional's fiduciary breach and breach of contract claims require a showing of injury or

damages.  See Randolph v. ING Life Ins. & Annuity Co., 973 A.2d 702, 709 (D.C. 2009)

---

[3] Headfirst Professional has stated that it does not intend to introduce any additional evidence as to damages because its claims seek only injunctive relief.  See Headfirst Prof'l's Mot. at 1 ("Headfirst Professional submitted evidence in support of all of its claims in the liability phase of trial.  Because Headfirst Professional is not pursuing damages, the claims do not require any additional showing of proof.").

("[B]reach of fiduciary duty is not actionable unless injury accrues to the beneficiary or the fiduciary profits thereby." (alteration in original) (quoting Beckman v. Farmer, 579 A.2d 618, 651 (D.C. 1990))); Tsinstolas Realty Co. v. Mendez, 984 A.2d 181, 187 (D.C. 2009) ("To prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by [the] breach." (emphasis added)).  And it is axiomatic that a party seeking the extraordinary remedy of injunctive relief must establish a substantial likelihood of success on the merits and the threat of irreparable harm.  See Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) ("A plaintiff seeking a preliminary injunction must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." (first, third, fifth, and seventh alterations in original) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008))); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004) (because they are "extraordinary remed[ies]," injunctions "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion" (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997))).

Headfirst Professional's claims rely primarily on the acts of "sabotage" perpetrated by Elwood after Sullivan terminated his employment in December 2012, namely, shutting down the company's Active.com registration system and Google AdWords account, and causing Bank of America to freeze the company's bank account.  See Headfirst Prof'l's Proposed Findings at 2–3 (setting forth Elwood's conduct with regard to Active.com, Bank of America, and Google AdWords); see also id. at 2 ¶ 8 ("Based on that conduct by Elwood, on May 3, 2012, Headfirst

Professional filed a lawsuit in D.C. Superior Court . . . ." (emphasis added)).  Each act of "sabotage" is discussed below.

      i.      <u>The Active.com camper registration system</u>: Elwood argues persuasively that Headfirst Professional has failed to offer any evidence of any harm resulting from shutting down the Active.com registration system in April 2013.  <u>See</u> Elwood's Opp'n to Headfirst Prof'l's Mot. at 7–8 (arguing that "there was no evidence adduced at trial that [Headfirst] Professional . . . lost a single camper as a result of the brief interruption to its online registration portal in 2013, or that Elwood's conduct even interfered with a single attempted registration" and citing evidence that "registration data was typically printed the week that [Headfirst] Professional . . . was holding the camp (i.e., sometime in the summer) and therefore would not have been used during the period of April 2013 in any event").  The Court therefore rejects Headfirst Professional's fiduciary breach and breach of contract claims to the extent that they rely on this conduct as the basis for obtaining the requested relief.

      ii.     <u>The Bank of America account</u>: Although Sullivan testified that freezing Headfirst Professional's bank account resulted in the company having "zero transactions for a period of two months," Headfirst Prof'l's Mot., Ex. A (Headfirst Prof'l's Proposed Findings) at 3 ¶ 22, the Court is persuaded by Elwood's contention that Headfirst Professional failed to put forth any evidence that freezing its bank account caused any harm, <u>see</u> Elwood's Opp'n to Headfirst Prof'l's Mot. at 9 ("[Headfirst] Professional . . . did not adduce any evidence that it was deprived of operating capital or that any bill went unpaid or purchase unmade.")  And although Sullivan testified that he was forced to sign a "hold harmless" agreement in order to unfreeze the bank account, Headfirst Prof'l's Mot., Ex. A (Headfirst Prof'l's Proposed Findings) at 3–4, there is no evidence that entering into this agreement resulted in Headfirst Professional or Sullivan

sustaining any harm, see Elwood's Opp'n to Headfirst Prof'l's Mot. at 10 (contending, accurately, "that there is no evidence that anything ever happened to Sullivan because of [the hold harmless agreement]").  The Court therefore also rejects Headfirst Professional's fiduciary breach and breach of contract claims as grounds for awarding the requested relief based on the freezing of Headfirst Professional's bank account.

iii.      The Google AdWords account: Sullivan testified that Headfirst Professional's marketing efforts were hampered in August 2013 by Elwood shutting down Headfirst Professional's Google AdWords account, which required him to expend resources to open a new account, and resulted Headfirst Professional losing the benefits derived from the longevity of the terminated account.  See Headfirst Prof'l's Mot., Ex. A (Headfirst Prof'l's Proposed Findings) at 3 ¶ 20.  However, no evidence was presented of the value derived from the longevity of the terminated account or whether there was an expense incurred to open a new account.  Further, Sullivan's testimony regarding the impact of losing the Google AdWords account only raised the specter of a potential loss of customers, but Headfirst Professional adduced no evidence that fewer parents enrolled their children for participation in Headfirst Professional's camps as a result of losing the prior AdWords account.  The Court therefore credits Elwood's argument that Headfirst Professional has failed to put forth any evidence of harm arising from the loss of its Google AdWords account, and the Court rejects Headfirst Professional's fiduciary breach and breach of contract claims as the basis for awarding the relief requested.

### b.  Whether Sullivan and Headfirst Professional Have a Sufficient Basis to Obtain a Judicial Order of Expulsion

The Court must determine whether the evidence adduced at trial warrants Elwood's judicial expulsion from Headfirst Professional pursuant to the District of Columbia Limited Liability Company Act's ("LLC Act's") expulsion provision.  See D.C. Code § 29-806.02(5).

To obtain relief under this provision of the District of Columbia Code, the plaintiffs must show that Elwood: (1) "[e]ngaged . . . in wrongful conduct that has adversely and materially affected" Headfirst Professional, id. § 29-806.02(5)(A); (2) "[w]illfully or persistently committed . . . a material breach of the operating agreement," id. § 29-806.02(5)(B); or (3) "[e]ngaged . . . in conduct relating to the company's activities which makes it not reasonably practicable to carry on the activities with the person as a member," id. § 29-806.02(5)(C).[4]

First, consistent with the "actual harm" analysis above, the Court rejects Headfirst Professional's expulsion claim to the extent that it relies on the first prong of the expulsion provision, which requires a showing that Elwood "[e]ngaged . . . in wrongful conduct that has adversely and materially affected" Headfirst Professional's activities and affairs.  D.C. Code § 29-806.02(5)(A) (emphasis added).  However, the Court may base its judicial expulsion order on the second prong, which requires a showing that Elwood "willfully or persistently committed . . . a material breach of the operating agreement."  Id. § 29-806.02(5)(B).

Whether Elwood's conduct constitutes a "material breach" of Headfirst Professional's operating agreement is a fact-intensive inquiry.  See 3511 13th St. Tenants' Ass'n v. 3511 13th St., N.W. Residences, LLC, 922 A.2d 439, 445 (D.C. 2007) ("Whether a particular breach of a contract is 'material' is a classic issue of fact.").  "A breach is material only if it relates to a matter of vital importance or if it goes to the essence [of the contract] and frustrates substantially

---

[4] Elwood's counsel asserted that Headfirst Professional's expulsion counterclaim, by its language, did not include a claim for expulsion under D.C. Code § 29-806.02(5)(C), and that the counterclaim is limited to subsections (A) and (B) of that provision.  See Feb. 2, 2017 Hearing Tr. at 20:7–21:11.  In opposition, Headfirst Professional directed the Court to paragraphs 32 through 41 of its counterclaim, which set forth factual allegations about Elwood's conversion of Headfirst Camps' and Headfirst Baseball's funds, which are incorporated into Headfirst Professional's LLC Act claim by paragraph 69 of the counterclaim.  See Feb. 2, 2017 Hearing Tr. at 34:19–36:9; see also Headfirst Prof'l's Countercl. ¶¶ 32–41, 69.  While the Court understands this argument to mean that Elwood's conversion would justify his expulsion under subparagraph (C), see Headfirst Prof'l's Countercl. ¶¶ 69–72 (containing language that mirrors subparagraphs (A) and (B) only), the Court agrees with Elwood that a remedy under that subparagraph is not sufficiently pleaded in Count V of Headfirst Professional's counterclaim, and the Court will therefore disregard subparagraph (C) in its analysis.

the purpose for which the contract was agreed to by the injured party." Kreisch v. Vilsack, 931

F. Supp. 2d 238, 253 (D.D.C. 2013) (quoting America v. Mills, 714 F. Supp. 2d 99, 100 (D.D.C.

2010)).  The evidence adduced at trial showed that Elwood converted Headfirst Baseball's and

Headfirst Camps' funds, and the jury concluded that this conduct constituted a breach of the

implied covenant of good faith and fair dealing contained in Headfirst Professional's operating

agreement.  Given the circumstances of this case, in which the operation of the several Headfirst

entities was closely managed by both Elwood and Sullivan, the Court finds that Elwood's

conversion of Headfirst Baseball's and Headfirst Camps' funds—companies Elwood managed in

conjunction with Sullivan—and his acts of "sabotage" in 2013 with respect to Headfirst

Professional—a company Elwood co-owned with Sullivan—relate to a matter of vital

importance to the agreement between them, i.e., Sullivan's ability to rely on Elwood to act in

good faith as a business associate.  The Court therefore finds that Elwood's conduct warrants his

expulsion as a member of Headfirst Professional pursuant to D.C. Code § 29-806.02(5)(B).

Elwood contends that, if the Court agrees that his judicial expulsion is proper, the Court

lacks discretion to expel him retroactively, Elwood's Opp'n to Headfirst Prof'l's Mot. at 19–22,

and that Headfirst Professional's request to retroactively expel him is an improper effort to

prevent evidence of damages on Elwood's claims against Sullivan and Headfirst Professional

from reaching the jury, id. at 16–18.[5]  Although the Court is unaware of any District of Columbia

---

[5] At oral argument, Elwood raised, for the first time, the specter of a "Beacon Theatre[s] problem" should the Court retroactively expel him from Headfirst Professional, see Feb. 2, 2017 Hearing Tr. at 85:9–25, but having reviewed the applicable case law and the parties' supplemental briefs on the applicability of the Beacon Theatres rule to this case, the Court agrees with the plaintiffs that no such "problem" exists.  The Beacon Theatres decision stands for the proposition that "[i]f there are factual issues common to both legal and equitable claims joined in the same suit, any party has a right to a jury trial determination of those issues before the court rules on the equitable claim."  Dawson v. Contractors Transp. Corp., 467 F.2d 727, 733 (D.C. Cir. 1972) (citing Beacon Theatres, Inc. v. Westover, 359 U.S. 500 (1959), and Dairy Queen, Inc. v. Wood, 369 U.S. 469 (1962)).  No such commonality of factual issues exists here because the Court's determination of Elwood's judicial expulsion as a member of Headfirst Professional turns on facts relating to his conversion and post-termination conduct, whereas the jury's determination of damages relating to Sullivan and Headfirst Professional's exclusion of Elwood from management of Headfirst Professional would turn on the finding that has already been made, i.e., that Sullivan did not have the authority under the

case law on the issue of retroactive expulsion, the opinion of the Court of Appeals of Utah in

Holladay v. Storey, 307 P.3d 584 (Utah Ct. App. 2013), is instructive.  In that case, two members

of an LLC sought to expel the third member of the company due to his misconduct in connection

with his management of the company.  Id. at 588.  The trial court expelled the third member and

backdated his expulsion "to December 31, 2005, based on the parties' conduct," concluding that

"this date was appropriate due to [the member's] mismanagement, misconduct, dishonesty,

breach of fiduciary duty, and lack of success as a manager as of that date."  Id. at 589.  The court

also stated that "it was not until 2005" that the other two members "started to 'seriously' follow

the [operating agreement] and statutes."  Id.  The Utah Court of Appeals affirmed the trial court's

retroactive expulsion, stating that the trial court

> could have backdated [the member's] expulsion as early as 2003 based on his
> misconduct.  Yet, the trial court also found that [the other two members] did not
> conduct themselves according to the [operating agreement] or the [Utah LLC] Act,
> or seek to remove [the member] as a member before 2005, when they first requested
> a preliminary injunction.

Id. at 593.  Holladay illustrates that although a court has discretion to retroactively expel a

member of a limited liability company, it should do so only after taking into consideration the

circumstances present in each case, instead of employing a formulaic or rigid application of the

statute.  The Court agrees with the Utah Court of Appeals' approach and therefore rejects

Elwood's argument that it lacks discretion to backdate Elwood's expulsion.

Here, Headfirst Professional seeks an order expelling Elwood as of December 28, 2012,

the date on which Sullivan terminated Elwood's management of Headfirst Professional.

Headfirst Prof'l's Mot. at 2.  But Headfirst Professional waited for over four months before filing

its lawsuit in the Superior Court.  See Headfirst Professional's Proposed Findings at 3 (stating

---

Headfirst Professional operating agreement or the LLC Act to unilaterally terminate Elwood's membership in
December 2012, see Verdict Form, Questions 10 & 11.

that Headfirst Professional did not file its suit until May 3, 2013).  This delay suggests that the

filing of Headfirst Professional's lawsuit was prompted not by Elwood's conversion of funds

from Headfirst Baseball and Headfirst Camps, which led to the termination of his management

of the company in December 2012, but by his post-termination acts of "sabotage," two of which

occurred shortly before Headfirst Professional filed its lawsuit in the Superior Court.  See supra

at 8–9 (setting forth the Court's findings of fact regarding Elwood's conduct in April and August

2013).  Just as the court in Holladay based its determination of the appropriate expulsion date on

the parties' conduct, and in light of the circumstances present in this case, the Court concludes

that May 3, 2013, the date Headfirst Professional filed its complaint in Superior Court, is the

appropriate retroactive date for Elwood's judicial expulsion.

Accordingly, the Court will (1) enter judgment in favor of Elwood on Headfirst

Professional's breach of fiduciary duty and breach of contract claims; and (2) enter judgment in

favor of Headfirst Professional on its claim for judicial expulsion pursuant to D.C. Code

§ 29-806.02(5)(B), retroactive to May 3, 2013.[6]

### B.    Sullivan and Headfirst Professional's Rule 50 Motion

#### 1.    Elwood's Partnership and Accounting Counterclaims

In their Rule 50 motion, Sullivan and Headfirst Professional argue that Elwood's

partnership claim should fail for three reasons: (1) the claims are equitable in nature and thus

barred by Elwood's unclean hands; (2) the partnership owns no assets; and (3) the partnership

---

[6] Because Elwood's arguments in his Rule 52 motion essentially track the arguments made in his opposition to
Headfirst Professional's Rule 52 motion, discussed above, see generally Elwood's Rule 52 Mot.; see also Feb. 2,
2017 Hearing Tr. at 46:20–24 (defense counsel agreeing with the Court that Elwood's arguments in opposition to
Headfirst Professional's motion also address Elwood's Rule 52 motion), the Court will issue an order: (1) granting
Elwood's Rule 52 motion with respect to Headfirst Professional's breach of fiduciary duty and breach of contract
claims; and (2) denying Elwood's Rule 52 motion with respect to Headfirst Professional's judicial expulsion claim.

was "wound up" as soon as Sullivan terminated Elwood's association with the Headfirst LLCs in December 2012, which effected Sullivan's dissociation from the partnership. Pls.' Damages Mot. at 2–7. Because the Court previously considered and ultimately rejected the plaintiffs' unclean hands argument in a prior Rule 50 hearing, see Dec. 9, 2016 Hearing Tr. at 36–59 (argument and ruling on the plaintiffs' motion for judgment on Elwood's partnership claim), and in light of the fact that the Court submitted the partnership claim to the jury, see Verdict Form (Question 3), the Court will not revisit at this stage arguments that were previously rejected. The Court will therefore focus its analysis on the latter two arguments.

### a. Sullivan's "Dissociation" from the Headfirst Partnership

The plaintiffs contend that on December 28, 2012, Sullivan dissociated himself from the partnership-at-will the jury concluded he and Elwood had created, when he sent Elwood a letter terminating Elwood's relationship with all of the Headfirst LLCs, Pls.' Damages Mot. at 6, and as a result, the partnership was immediately dissolved and wound up, and because the partnership has no assets (as asserted by the plaintiffs), no accounting is necessary because there are no profits to distribute, id. at 7 (citing D.C. Code § 29-608.01(1) ("A partnership is dissolved, and its activities and affairs shall be wound up, only upon the occurrence of the following events . . . (1) In a partnership at will, the partnership's having notice from a partner . . . of that partner's express will to withdraw as a partner, or on a later date specified by the partner."); see also D.C. Code § 29-601.02(11) ("'Partnership at will' means a partnership in which the partners have not agreed to remain partners until the expiration of a definite term or the completion of a particular undertaking.").

In opposition, Elwood asserts that the plaintiffs should not be allowed to rely on Sullivan's dissociation from the Headfirst partnership as a bar to Elwood's partnership and

accounting claims because this theory was never raised in the plaintiffs' answer or defenses to Elwood's counterclaim.  <u>See</u> Elwood's Opp'n to Pls.' Damages Mot. at 18 ("Sullivan could have, but never pled in the alternative that, were a partnership to exist, he withdrew from that partnership.")  The Court agrees that the "dissociation" theory, raised for the first time in the plaintiffs' Rule 50 motion, is untimely because it should have been pleaded in the plaintiffs' responsive pleadings, and at this late juncture, would constitute an improper amendment to the plaintiffs' pleadings.  <u>See</u> Fed. R. Civ. P. 12(b) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required.").

### b.  The Headfirst Partnership's Assets

To support their argument that Elwood's partnership and accounting claims should not proceed to the damages phase, the plaintiffs largely revisit their previously-rejected arguments that the Headfirst partnership and the several Headfirst LLCs could not coexist.  <u>See</u> Pls.' Damages Mot. at 3–6 (arguing that the Headfirst partnership has no assets because all of the business assets belong to the various Headfirst LLCs).  In opposition, Elwood argues that the Headfirst partnership was a "service business" whose "value comes from its power to attract returning customers year after year, an intangible asset called goodwill," Elwood's Opp'n to Pls.' Damages Mot. at 8; <u>see also</u> <u>id.</u> ("This is the asset that was valuable to STEEL when it made a multi-million dollar offer to Elwood and Sullivan to purchase all of the Headfirst business and not a particular LLC."), and that he should be permitted to present the value of this asset to the jury, <u>see</u> <u>id.</u>

In response, the plaintiffs assert that any evidence based on the alleged value of the Headfirst partnership's goodwill is precluded by the Court's denial of Elwood's motion to amend his counterclaims to include allegations regarding Sullivan's alleged misappropriation of that

asset.  Feb. 2, 2017 Hearing Tr. at 76:15–20; see also Elwood's Mot. to Amend, Ex. B, ¶¶ 160,

162, 174–77 (proposed amended allegations asserting that Sullivan misappropriated the

Headfirst partnership's goodwill); Headfirst Baseball LLC v. Elwood, ___ F. Supp. 3d ___, ___,

2016 WL 4574622, at *5–6 (D.D.C. Sept. 1, 2016) (Walton, J.) (denying as untimely Elwood's

motion to amend his counterclaim to add, inter alia, the same allegations regarding Sullivan's

alleged misappropriation of goodwill).  The Court agrees that any evidence relating to Sullivan's

alleged misappropriation of goodwill cannot be presented in the damages phase of the trial,

because allowing that evidence to be presented to the jury would in effect vitiate the Court's

previous ruling on Elwood's motion to amend.  Because evidence of Headfirst partnership's

goodwill is the only evidence Elwood seeks to present in the damages phase regarding his

partnership and accounting claims, see generally Elwood's Opp'n to Pls.' Damages Mot. at 7–8,

the Court will grant the plaintiffs' motion for judgment with respect to damages on these claims.[7]

### 2. Elwood's Counterclaim under the District of Columbia Limited Liability Company Act

Having concluded that judicial expulsion of Elwood as a member of Headfirst

Professional is appropriate, but retroactive only to May 3, 2013, see supra at 15, the Court

concludes that Elwood is potentially entitled to damages for the period between December 28,

2012, and May 3, 2013, as a result of the jury's finding that Sullivan and Headfirst Professional

violated the LLC Act by terminating Elwood's management of the company.  See Verdict Form

(Questions 13 & 14 and the jury's verdict).  The plaintiffs contend, however, that "the same

---

[7] In any case, as the Court has indicated during hearings on several occasions, it appears that the evidence establishes only that the Headfirst partnership functioned as a management company dedicated to managing and growing the business of the various Headfirst LLCs.  As such, the Court fails to appreciate how such a management company would have any assets or value beyond those generated by the underlying LLCs, and therefore, even under Elwood's assertion that "goodwill" comprises the Headfirst partnership's assets, the Court cannot conceive of a circumstance in which the value of that goodwill should not be credited to the underlying Headfirst LLCs that actually comprised the camps that the Headfirst partnership merely managed.

[contractual] defenses that apply to Elwood's breach of the Headfirst Professional operating

agreement claim should apply to his statutory claim," and therefore, that Elwood's LLC Act

claim is defeated by the jury's finding that Elwood breached the implied covenant of good faith

and fair dealing by converting Headfirst Baseball and Headfirst Camps funds.  See Pls.'

Damages Mot. at 8.  In a similar vein, the plaintiffs also argue that they are entitled to judgment

with respect to damages on Elwood's LLC Act claim because Elwood's rights as a member of

Headfirst Professional are governed by the Headfirst Professional operating agreement, and not

by the default provisions of the LLC Act.   See id.

The plaintiffs' arguments conflate Elwood's breach of contract claim with his LLC Act

claim.  Elwood's LLC Act claim sought to establish that Sullivan and Headfirst Professional

unilaterally excluded Elwood from the management of Headfirst Professional without first

obtaining a judicial order, in violation of the LLC Act, see Elwood's Countercl. ¶ 96, a claim the

jury credited, see Verdict Form (Questions 13 and 14 and the jury's verdict), which consequently

entitles him to be "compensated . . . for the value of his ownership share in [Headfirst]

Professional . . . , subject to debts, obligations, or liabilities owed to the other members in"

Headfirst Professional, Elwood's Countercl. ¶ 99.  In support of his position, Elwood references

provisions of the LLC Act pertaining to what occurs after a person is dissociated from his

membership in a limited liability company.  See id. ¶ 100 (citing D.C. Code § 29-806.02(5)

(setting forth the grounds for judicial expulsion of an LLC member); § 29-806.03 (detailing the

effect of a member's dissociation from an LLC, including that "any transferable interest owned

by a person immediately before dissociation in the person's capacity as a member is owned by

the person solely as a transferee"); and § 29-805.01 (providing that a "transferable interest is

personal property")).  Thus, although Elwood's breach of contract and LLC Act claims share a

factual nexus—Sullivan's termination of Elwood from his association with Headfirst

Professional—the Court finds these claims to be distinct and will therefore reject the plaintiffs'

assertions that their contractual defenses apply equally to Elwood's LLC Act claim and that this

claim is precluded by the existence of the Headfirst Professional operating areement.

The inquiry does not end there, however.  Elwood seeks to prove, as damages he is

entitled to recover based on his LLC Act claim, that after he was terminated, Sullivan diverted

"in excess of $2,795,000 of [Headfirst Professional's] profits to Headfirst Baseball LLC and

Headfirst Camps LLC," Elwood's Opp'n to Pls.' Damages Mot. at 24.  At oral argument, the

plaintiffs opined that evidence of the alleged diversion of Headfirst Professional's profits cannot

be presented to the jury because the Court denied Elwood's June 2016 motion to amend his

counterclaim, which had as its basis the same alleged diversion.  See Feb. 2, 2017 Hearing Tr. at

55–57; see also Elwood's Mot. to Amend, Ex. B ¶¶ 102, 111 (proposed additional allegation that

Sullivan "[d]ivert[ed] funds of Professional Sports LLC to Headfirst Baseball LLC and/or

Headfirst Camps LLC, the profits of which Sullivan has wrongfully claimed as his own").  The

Court agrees that allowing Elwood to introduce evidence of the alleged diversion of funds from

Headfirst Professional to Headfirst Baseball and Headfirst Camps would permit an end-run

around the Court's September 2016 opinion denying Elwood's motion to amend his

counterclaim as untimely.  See Headfirst Baseball, ___ F. Supp. 3d at ___, 2016 WL 4574622, at

*6 (concluding that Elwood failed to establish good cause for his request to amend his

counterclaim long after the Court's scheduling deadlines had passed).  Therefore, because

Elwood relies on the "diversion" evidence to support his claim for damages on his LLC Act

claim, see generally Elwood's Opp'n to Pls.' Damages Mot. at 23–24, the Court will grant

judgment in favor of the plaintiffs on Elwood's LLC Act claim.

**IV.     CONCLUSION**

For the foregoing reasons, the Court will grant Sullivan and Headfirst Professional's

motion for judgment as to damages, grant in part and deny in part Headfirst Professional's Rule

52 motion, and grant in part and deny in part Elwood's Rule 52 motion.[8]

**SO ORDERED** this 3rd day of March, 2017.

REGGIE B. WALTON
United States District Judge

---

[8] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.